**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS—EASTERN DIVISION**

B.G., by his next friend, J.A.G., and J.A.G.,
Individually and as Parent and Next Friend of
B.G.,

                Plaintiffs,

      v.

BOARD OF EDUCATION OF THE CITY
OF CHICAGO,

              Defendant.

Case No. 1:15-cv-06372

**MOTION FOR JUDGMENT
REVERSING ADMINISTRATIVE
DECISION**

## TABLE OF AUTHORITIES

### FEDERAL COURT CASES

*Board of Educ. of Community Consol. Sch. Dist. 21 v. ISBE*,
    938 F.3 712 (7th Cir. 1991) ................................................3

*Board of Educ. of Oak Park & v. ISBE & Kelly E.*,
    21 F.Supp.2d 862 (N.D. Ill. 1998) ................................................5

*Elmont Union Free Sch. Dist.*,
    401 IDELR 131 (NYS 1988) ................................................6

*Evanston Commun. Consol. Sch Dist. v. Michael M.*,
    356 F.3d 798 (7th Cir. 2004) ................................................3

*Harris v. District of Columbia*,
    561 F.Supp.2d 63 (D.D.C. 2008) ................................................8

*Jefferson County Bd. of Educ. v. Lolita S.*,
    977 F.Supp.2d 1091 (N.D. Ala. 2013) ................................................4-5

*Krista P. v. Manhattan Sch. Dist.*,
    255 F.Supp.2d 873 (N.D. Ill. 2003) ................................................3, 4

*Lenn v. Portland Sch. Comm.*,
    998 F.2d 1083 (1st Cir. 1993) ................................................6

*McKinney Indep. Sch. Dist.*,
    58 IDELR 157, pp. ? 59 IDELR 261 (E.D. Texas 2012)....................................................21

*Millburn Township*,
    63 IDELR 229 (D.N.J. 2014).......................................................................................7

*Phillip C. v. Jefferson County Bd. Of Educ.*,
    701 F.3d 691 (11th Cir. 2012) ..................................................................................3

*Schaffer v. Weast*,
    546 U.S. 49 (2005)...................................................................................................3

*Warren G. v. Cumberland Co. Sch. Dist.*,
    190 F.3d 80 (3d Cir. 1999).........................................................................................5

## ADMINISTRATIVE CASES

*Ann Arbor*, 24 IDELR 621 (Michigan SEA 1996) ...............................................................6

*Camp Hill SD*, 38 IDELR 113 (Pa. SEA 2002).................................................................31

*CPS,* 22 IDELR 1008 (1995)...................................................................................................5

*CPS*, 110 LRP 51160(2010 ......................................................................................................6

*CPS*, Case 2008-0366, 109 LRP 72748 (ISBE 2009).......................................................6

*CPS*, Case 2009-0215, 109 LRP 72740 (ISBE 2009).......................................................6

*CPS*, Case 2009-0035, 110 LRP 36642 (2009) ...............................................................5

*CPS*, Case 2009-0318, 109 LRP 72742 (ISBE 2009)...................................................6, 7

*CPS*, Case 2010-0238, 110 LRP 50960 (2010) ...............................................................5

*CPS*, Case 2012-0246, 113 LRP 12570 (ISBE 2013).....................................................32

*CPS*, Case 2014-0001, 64 IDELR 185 (ISBE 2014) .......................................................4

*CPS*, Case 2014-0157, 14 LRP 44696 (SEA IL 2014) ....................................................6

*CPS*, Case 4041, 44 IDELR 294 (ISBE 2005)..............................................................4, 5

*Fairfield Board of Educ.*, 115 LRP 1558 (CT SEA 2015) ...............................................6

*Glendale USD*, 51 IDELR 146 (CA SEA 2008)................................................................5

*Ingram Indep. Sch. Dist.*, 35 IDELR 143 (Texas SEA 2001)...........................................................5

*Long Beach USD*, 33 IDELR 113 (SEA 2000).....................................................................................

*Long Beach USD*, 36 IDELR 150 (CA SEA 2002) ........................................................................6

*Montgomery County Pub. Sch.*, 40 IDELR 579 (MD SEA 2003)                                    7

*Plainfield Sch. Dist. 202,* 63 IDELR 145 (IL SEA 2014)...........................................................32

# INTRODUCTION

B.G. started at George Armstrong Elementary in pre-K.  He repeated first grade and late in second grade entered special education as a child with a specific learning disability (LD). Initial assessors saw ADHD characteristics as the primary underlying factor, suggested medical follow up, and noted other processing problems.  (AR 1887, 1889.)  B.G. spent grades 4-7 with the same special education teacher, Mr. Gorak, and his behavior worsened. (AR 1794.)  In 2012, Chicago Public Schools (CPS) summarily dismissed ADHD concerns and retained LD eligibility without explaining why.  (AR 1789.)  In spring 2014, Gorak attributed B.G.'s poor progress mainly to lack of effort (AR 1698-1700) and motivation (AR 1683), as well a "visual perceptive disorder" he thought might be a "primary" barrier to reading (AR 1729) and expressive language "struggles" that interfered with written expression.  (AR 1617.)  B.G. was hospitalized twice during the 2013-14 school year and missed much school due to his father's medical problems and his own.   After B.G.'s father died in April 2014, and B.G. was hospitalized including time in an ICU with diagnoses of morbid obesity, hypertension, severe obesity-related hypoxia syndrome, and Type 2 diabetes and obstructive sleep apnea, he returned to school at the end of spring 2014.   He was under orders to use oxygen during the day.  (AR 1692.)  Medical records sent to Armstrong described him as intellectually disabled/MR (ID).  (AR 1689-90; 1701-08. )

In July 2014, J.A.G., through counsel, filed for hearing under the Individuals with Disabilities Education Improvement Act of 2004 (IDEIA) and Illinois law.  She asserted that CPS had denied a free appropriate public education ("FAPE") for B.G., who was nearly 14, and requested reevaluation and intensive academic and emotional support.  (AR 289-305.)

In August 2014, CPS requested and received permission to reassess more comprehensively than before, including a speech/language pathologist (SLP), an OT, a PT and an assistive

technology (AT) assessor, each for the first time. CPS moved B.G. to a new teacher, Dr. Obialor, and listed her as a planned assessor. A few days before an IEP meeting scheduled for October 9, 2014, the District presented seven reports as its Full Individual Evaluation (FIE). CPS proposed to change eligibility to "emotional disability" (ED). While the tone was more sympathetic, the bottom line was still that B.G. was not learning because he would not try. Assessors ignored medical impressions of ID and reported without comment CPS's previous LD classification and ADHD observations. On October 9, 2014, the District changed B.G.'s primary eligibility to ED but agreed to retain the LD label. The IEP team offered a "Separate Day Placement" without specifying a school or kind of program. (AR 732).

A few days later—with placement, services, and compensatory education still unresolved-- B.G.'s mother requested an Independent Educational Evaluation (IEE). (AR 228-29.) Rather than agreeing to fund assessments or responding substantively, CPS filed for hearing to establish the appropriateness of its assessments. (AR 310-11.) A hearing was convened during five days—some short and some normal—from February 23-March 9, 2015. Additional time for testimony by one of student's two expert witnesses was scheduled (AR 534) but cancelled by the hearing officer, who had indicated she needed time to write the decision before a planned vacation (AR 3635 ll. 9-11). In barring further testimony, the IHO reversed her findings during voir dire as to the areas in which Dr. Bailey could testify.

The IHO determined CPS met its burden of proof as to all assessments. Educational issues were resolved via settlement, leaving open student's ability to seek reimbursement for IEEs done in preparation for the second planned round of hearing, further IEEs, and related fees.

## STANDARD OF REVIEW

For matters of law, this court exercises de novo review. *Board of Educ. of Community Consol. Sch. Dist. 21 v. ISBE*, 938 F.3 712, 715-16 (7th Cir. 1991). In cases involving the

adequacy of educational programming, in which no new evidence is presented in court, there is considerable deference on factual issues on the grounds that courts should not substitute their notions of educational policy for those of hearing officers with expertise. *Evanston Commun. Consol. Sch Dist. v. Michael M.*, 356 F.3d 798, 802 (7th Cir. 2004); *Krista P. v. Manhattan Sch. Dist.*, 255 F..Supp.2d 873, 884 (N.D. Ill. 2003).    These considerations do not apply to determining whether assessment rules were followed.  Moreover, the family requests admission of additional evidence which, if granted, would reduce deference.   But under any standard of review, the pervasiveness and gravity of factual errors in the IHO's decision warrant reversal.

### LEGAL REQUIREMENTS FOR ASSESSMENT

IEEs are a crucial procedural safeguard allowing parents "firepower" to challenge decisions by school districts. *Schaffer v. Weast*, U.S. 49, 60-61 (2005).  Public funding lets "a class of parents" who cannot afford to pay for expert opinions enforce their children's rights under IDEIA.   *Phillip C. v. Jefferson County Bd. Of Educ.,* 701 F.3d 691, 697-98 (11th Cir. 2012). Often parents initially fund assessments and seek reimbursement at hearing.  In this case, B.G.'s mother sought public funding for assessments she could not afford.  That right was critical here. It was not clear what disabling condition(s) B.G. had, or how downward trajectory could be reversed.  Each of IDEIA's regulations—which were attached to B.G.'s original complaint— mattered for B.G, as did Illinois's requirement that evaluations constitute a "carefully completed case study fully reviewed by professional personnel in a multidisciplinary staff conference." 105 ILCS 5/14-8.02(b).  "IDEA regulations §§300.532-300.533 provide the minimum requirements for an evaluation, but it is clear that the evaluation process should continue until enough information is obtained to correctly identify the student's problem."  *CPS*, Case 4041, p. 6, 44 IDELR 294 (2005).  Hearing officers uphold assessments when proper procedures are followed, and either needs and effective interventions are identified, *e.g. CPS*, Case 2014-0001,

pp. 8, 12-13, 64 IDELR 185 (ISBE 2014), or eligibility is legitimately ruled out. *Krista P. v. Manhattan School District,* 255 F. Supp. 2d 873 (N.D. Ill. 2003).

Though the IHO's legal determinations in conducting B.G.'s hearing and rejecting his claims were largely implicit, pervasive errors can be identified.

## I.     The IHO required B.G. to prove that errors changed results.

The IHO shifted the burden of proof: though CPS's psychology assessment was concededly flawed, she noted that B.G.'s expert "was not able to definitively state that these errors rendered the results of the assessment invalid" and "based upon the above" found it complied with applicable regulations. (AR 64.) Proving that correct testing would have yielded different results would rarely be possible, and would require independent testing. The IHO's approach precludes parents who cannot afford assessments from getting them at public expense.

## II.    The IHO improperly excused CPS from assessing for suspected disabilities unless B.G. could prove he had them.

Districts are not required to investigate "'problems that may be contributing to a disability with respect to which a local education agency has no reason to suspect given the results of its tests, rating scales, and teacher observations.'" *Jefferson County Bd. of Educ. v. Lolita S.*, 977 F.Supp.2 1091, 1108 (N.D. Ala. 2013). But they are not free to rely on pre-assessment notions or confine their investigations of suspected disabilities to areas pointed out by parents or other professionals. Identifying ADHD is feasible and necessary and cannot be foisted by districts onto parents or doctors. *CPS,* 22 IDELR 1008, pp. 3-4 (1995). It is important to distinguish between ADHD symptoms and lack of effort and defiance, with which they are often confused. *Glendale USD,* 51 IDELR 146, p. 4, -11 (CA SEA 2008). Students with ADHD cannot be presumed "emotionally disturbed." *Ingram Indep. Sch. Dist.*, 35 IDELR 143 (Texas SEA 2001). Districts cannot attribute ADHD characteristics to other conditions without careful "differential

diagnosis." *Montgomery County Pub. Sch.*, 40 IDELR 579, pp. 7-8 (MD SEA 2003).

### III. The IHO created a false "labels" vs. "needs" dichotomy.

The hearing officer discounted the importance of "labels" and accepted the rationales that staff focused instead on "needs." (AR 63.) But "school authorities cannot properly address problems which they do not understand." *Board of Educ. of Oak Park & v. ISBE & Kelly E.*, 21 F.Supp.2d 862 (N.D. Ill. 1998) (necessary to consider LD and ADHD); *CPS* 4041, 44 IDELR 294 (ISBE 2005) (failure to identify non-emotional components of student's problems rendered assessments inappropriate). Ascertaining which IDEIA classification(s) apply is a necessary part of assessments. *CPS* 2012-0246, 113 LRP 12570 (2013). It is often a prerequisite to developing an appropriate IEP. *CPS* 2010-0238, 110 LRP 50960, pp. 17-18, 21 (2010). Understanding disabilities is necessary to identifying effective, research-based methodologies. *Cf. CPS 2009-0035*, 110 LRP 36642, pp. 16, 19 (2009). IEEs are warranted when assessments fail to specify needs concretely. *Warren G. v. Cumberland Co. Sch. Dist.*, 190 F.3d 80, 87 (3d Cir. 1999); M*ontgomery County Pub. Sch.*, 40 IDELR 579, p. 8 (MD SEA 2003).

### IV. The IHO let CPS sweep aside concerns not deemed "primary."

Districts must assess all needs, and cannot over-focus on emotions and attendance because they deem those primary, to the detriment of examining academic issues. *CPS Case 2008-0366*, 109 LRP 72748, p. 23, 27-28 (ISBE 2009). Nor can they attribute problems to lack of effort without checking carefully other barriers to learning. *E.g. CPS Case 2009-0318*, 109 LRP 72742, pp. 5-7 (ISBE 2009); *Long Beach USD*, 36 IDELR 150 (CA SEA 2002). An IEP is an educational package that must target all of a student's unique educational needs that relate to the disability. *Lenn v. Portland Sch. Comm.,*998 F.2d 1083, 1089 (1st Cir. 1993).

### V. The IHO effectively presumed assessors' knowledge.

The hearing officer recited staff backgrounds and concluded in virtually identical language

that each person, based on credentials and "education, training, and experience," was "trained and knowledgeable."  (AR 59, 64, 67, 69, 72-73.)  Inferring sufficiency of knowledge from hiring and promotion decisions by challenged districts negates their duty to prove that staffers have the necessary knowledge and skill to assess the student in areas of need and to formulate appropriate recommendations.  *Ann Arbor*, 24 IDELR 621 (Michigan SEA 1996).   The IHO disregarded extensive  information that B.G.'s assessors were not sufficiently trained and knowledgeable regarding their instruments, his disabilities, or research-based interventions.

### VI.  The IHO excused assessment gaps by underestimating districts' responsibility to assess in hard cases.

Districts must assess in all areas.  *See, e.g., CPS Case 2009-0215*, 109 LRP 72740 (ISBE 2009) (assessment which omitted written language defective).  Districts may not give up because a student is hard to assess.  *E.g. CPS Case 2014-0157*, 14 LRP 44696, pp. 27-28 (2014); *CPS,* 110 LRP 51160 (2010); *Fairfield Board of Educ.*, 115 LRP 1558, pp. 4-6 (CT SEA 2015). Nonstandardized inquiries must be used if students cannot or will not use norm-referenced instruments.   *E.g. Elmont Union Free Sch. Dist.*, 401 IDELR 131, p. 3 (NYS 1988).

### VII.  The hearing officer gave lip service to the requirement for a "carefully completed case study" (AR 59)  but eviscerated it.

Districts cannot conduct assessments in silos in which information collected by one assessor is ignored by others, see, e.g., *Long Beach USD*, 33 IDELR 113, pp. 3, 14 (SEA 2000), or ignore signs of developmental or psychiatric impairments.  *Millburn Township*, 63 IDELR 229, pp. 5-8 (D.N.J. 2014).   The IHO excused gaps and contradictions by attributing them to noncommunication rather than understanding this was a problem.  (*E.g.* AR 14-15, #16; AR 60.)

### VIII. The hearing officer improperly excluded and rejected testimony.

Limiting and ignoring student's experts because they had not personally evaluated B.G. barred him from a publicly funded IEE because he had not previously had a private one.

Congress did not create a system in which parents who could front money for assessments could seek reimbursements, while those who could not are at the mercy of district assessors. Rather, districts can avoid public funding only if they show their assessments are appropriate—a system which would be a charade if parents could only prevail by pre-funding assessments.

The IHO allowed very little time for student's experts to testify about the subjects in which she acknowledged expertise, rejected broader testimony, and discounted what they did say, in part because they were not specialists in the field on which they were commenting. Student's experts underwent extensive voir dire. (AR 2237-73; 2565-2602; 3086-3113.) They easily met requirements for expert testimony under FRE 702. They are experts in educating students with disabilities and in combining information from multidisciplinary assessments in order to define student needs and locate effective interventions. (AR 1919-29.)

**IX.  The IHO improperly narrowed issues to a subset of B.G.'s pre-hearing concerns.**

The hearing officer required B.G. to present detailed criticisms of assessments, with regulatory references before hearing (AR 420, 451), which counsel did (AR 422-34), while reserving objections to this procedure as it reduced CPS's burden of proving the appropriateness of its assessments. (*E.g.* AR 467.)  The IHO solicited a response to her summary of issues (AR 457, 464) and ignored the one B.G. provided. (AR 467-495.)  She described issues for decision at AR 7-11; they were unchanged from her original order at AR 451-57.

## ARGUMENT PERTAINING TO EACH ASSESSMENT

**I.  CPs's psychological assessment was pervasively flawed.**

B.G.'s psychological evaluation was written by District-level psychologist Cintron, based on work by her and site-level psychologist Coelho. It was the broadest and set forth a new "ED" eligibility.  CPS mishandled all components and failed to analyze their interconnections.

A. Assessors failed to describe B.G.'s recent or current program.

Observations and interviews should gather information about programming so as to make recommendations for continuity and/or change. 34 CFR § 300.305(a)(2)(iii)(B). Assessments are designed to monitor programming, not just "follow" student progress or lack thereof. *Harris v. District of Columbia*, 561 F.Supp.2d 63 (D.D.C. 2008). Yet Cintron ignored B.G.'s school environment both as a possible contributor to difficulties and as a variable that might be altered. CPS did not report clearly what B.G.'s program was. She wrote both that he was repeating 7th grade and in 8th grade. (AR 682-83.) She explained he was receiving special education in "an instructional setting" (AR 683) but did not or disclose class sizes, ratios, composition, behavior and language modeling, instructional methodologies, curricula, expectations or management style. The report referred to "his paraprofessional" (AR 683) but did not explain how much this person was with him or what she did--information needed for IEP development. (AR 744, 747.)

B. The cognitive assessment was deeply and concededly flawed.

1. *The IHO ignored CPS's lead psychologist's admission that she had misdefined "borderline" and actually did not even think the term applied.*

Cintron admitted that her report's sole explanation of the term "borderline"—as implying "adequately developed" (AR 687)—was "a mistake." (AR 2428 ll. 1-18.)

CPS's report on B.G.'s intelligence as measured by the WISC-IV was unequivocal—it was "borderline." (AR 686, 691.) Dr. Goldstein explained that B.G.'s reported IQ of 71 was just above (or perhaps, given the standard error of measurement at or below) the cutoff for intellectual disability (AR 3356 l. 2 - 3357 l. 14), and that were this a meaningful score, B.G. might well have ID, or be so close to that level that interventions and expectations would likely shift dramatically. (AR 3357 l. 3 – 3358 l. 17; 3372 ll. 15 – 19.) Cintron did not discuss the implications of an IQ of 71 in her report, nor did she urge any caution with respect to this figure.

It turned out that at least by hearing, Ms. Cintron did not agree with this core conclusion. She conceded that she should have cautioned--as she did for academic scores--that the scores might underestimate B.G.'s true ability. (AR 2393 ll. 13-22.) She did not know whether behaviors during the test itself required caution, but thought the borderline score was the result of emotional disability and perhaps also lack of curricular exposure rather than a real drop in intelligence. (AR 2370 l. 2 – 2371 l. 15; 2393 l. 23 – 2394 l. 15.) Though Cintron initially claimed that B.G.'s WISC score of "71" was "valid" despite errors (AR 2442 ll. 7-8), she conceded that it was not "valid" as the term is used in testing because it did not reflect the construct which it was intended to measure. (AR 2463 l. 4 - 2464 l.15.) Cintron did not know whether this misleading report carried risks for B.G.'s educational and vocational future. (AR 2399 ll. 3 – 11.) Dr. Goldstein explained that the new theory risked diverting B.G. from a remediation track for students with learning disabilities onto a track for more impaired students. (AR 3357 l. 3 – 3358 l. 17; 3372 ll. 15 – 19.)

> 2. *Cintron failed to analyze B.G.'s s dramatic IQ drop; the hearing officer's finding to the contrary is incorrect and confused.*

Dr. Goldstein testified that it is necessary to analyze IQ drops. (AR 3318 ll. 5-16.) Cintron admitted she "should have included intelligence" in reporting regression (AR 2393 ll. 2 – 22.) Though one could glean by comparing AR 684 to AR 691 that B.G.'s IQ had fallen from low average to just above the cutoff for ID, Cintron did not note or try to explain the drop. The IHO thought that IQ drop had "lead her to the conclusions (sic) that the Student had an emotional disability." (AR 62.) Had Cintron argued this at hearing, it would have made no sense, but she did not. (AR 2370 l. 2 – 2371 l. 15; 2390 l. 23 -2394 l. 15.) Her report made no comparison.

> 3. *Failure to report discrepancies among WISC-IV scores violated the test's procedures; the hearing officer erred in finding there were none to report.*

CPS failed to report, and denied at hearing, significant discrepancies within IQ testing, and

the IHO agreed.  (AR 14, ¶¶ 13-14.)  Both psychologists purported to rule out discrepancies with a simple "eye-balling" calculation, but revealed at hearing that the test had been machine scored (which yields more precise information).  (AR 2405 l. 23 – 2410 l. 23; AR 2475 l. 4 – 2482 l. 4.)  When finally produced, protocols showed substantial discrepancies between the verbal comprehension index on one hand and perceptual reasoning, working memory, and processing speed on the other (AR 1948), as Dr. Goldstein testified.  (AR 3360 l. 6 – 3370 l. 15.)

4. *Behavioral observations needed to be, and were not, reported for the WISC-IV.*

Coelho, who gave the WISC-IV, left blank the section for "behavioral observations."  (AR 1023).  Cintron and Coelho agreed that test behavior needed to be reported but Cintron did not know or want to disturb Coelho on maternity leave and Coelho noted she did not write the report.  (AR 2323 l. 23 – 2324 l. 6;  2429 l. 8 - 2431 l. 5; 2482 l. 12 – 2483 l. 20.)

5. *The IHO wrongly found it harmless that CPS had reported low IQ scores without cautions as to their use for a student with B.G.'s language background.*

The IHO overlooked CPS's failure to present any evidence that the WISC-IV was appropriate given B.G.'s profile as a bilingual student with low language scores and attention problems.  The IHO found that both psychologists were "aware of cautions regarding administration of the WISC-IV to English language learners" (AR 61) and had taken precautions by ensuring that B.G.'s English was sufficient for testing.  She was wrong in both respects.  She cited her own recitations in AR 15 ¶ 17, which indicates that PSY2 was "*not aware of any cautions*" in using the WISC-2 for bilingual students (emphasis added), and AR 16 ¶ 25 & AR 19 ¶ 37, which assert that B.G. was good in both languages and "not an English learner," respectively.  Neither supports the proposition that either psychologist knew what guidelines were provided by publishers or other researchers.   The HO ignored Cintron's testimony that she did not know whether B.G. was classified as an English learner by CPS and knew he received

aide help in Spanish (AR 2381 l. 24 – 2382 l. 15), documentary evidence that he had been and

remained so classified (AR 742, 743 2014), and Dr. Goldstein's unrebutted testimony that using

the WISC-IV requires interpretive caution for students from bilingual, bicultural backgrounds.

(AR 3341 l. 4 – 3442 l. 19; AR 3370 l. 18 – 3372 l. 19.)

> 6. *The IHO improperly upheld CPS's nonstandard administration of the WISC-IV—first revealed at hearing--with no evidence that Spanish had been used in a permissible way and proof that failure to disclose doing so was wrong.*

It emerged at hearing that despite claims that B.G.'s English sufficed for monolingual

testing that "sure," Coelho had interjected Spanish while giving the WISC-IV.  (AR 2506 l. 20 –

2507 l. 4.)   Coelho conceded that mixing Spanish into primarily English IQ testing might have

confused B.G (AR 2509 ll. 8-24; AR 2511 ll. 9-19), and the hearing officer agreed (AR 13-14 ¶

11), but found no problem nonetheless.  (AR 61-62.)  She called the use of Spanish "minimal"

even though the psychologist could not say how much it happened (AR 2509 ll. 5-7; AR 2506 l.

20 – 2507 l. 1.)   The IHO relied on Coelho's conclusory claim that "fail[ing] to note the use of

Spanish translation in the WISC-IV protocols did not invalid (sic) the test results" (AR at 14),

even though Coelho admitted not knowing whether the WISC allows translation, whether

translating would defeat standardization (AR 2507 l. 5 – 2508 l. 13), or whether shifts to Spanish

improperly cued B.G. that his initial answers were unsatisfactory (AR 2530 l. 15 -2531).

Goldstein testified without contradiction that use of translation is permitted if necessary but is a

nonstandard administration which prevents B.G.'s scores from being interpreted based on

population norms, that ad hoc, "as needed" use of translation risked improper cueing (AR 3344 l.

18 – 3346 l.  AR 2495 l. 9), and that being pressed to shift back and forth between languages

might hurt performance.  (AR 3346 l. 12 – 3350 l. 17; 2495 l. 18 – 2498 l. 5.)

The IHO thought Coelho had conceded that she should have reported using Spanish and

accepted her opinion that this error did not matter; in fact, she did not know whether she had

done anything wrong.  (AR 64; AR 2508 l. 20 – AR 2509 l. 4.) Goldstein testified without contradiction that reporting was necessary.   (AR 3318 ll. 17-23.)   The IHO ignored the case law she cited elsewhere (AR 68) for the need to report nonstandard administration (AR 62).

> 7. *WISC-IV scores were consistent with existing suspicions of ID that needed to be confronted; yet the IHO accepted Cintron's incorrect theory that a few higher subtest scores automatically ruled out ID.*

Though the IHO strangely thought B.G.'s counsel was arguing that he had ID which CPS failed to identify (AR 60), their actual and correct point was that ID should have been considered (The IHO omitted part of B.G.'s closing argument; he will seek its admission.)  Medical records sent by providers to CPS documented diagnostic "impressions" of intellectual disability, and the District's IQ score of 71 and adaptive score of 59 would, if shared with medical providers, reinforce such views.  B.G. had experienced hypoxia, and the nurse knew he was refusing to follow doctor's orders for oxygen and a night-time "machine."  (Infra at V(A)?.)  He was failing educationally in a cross-categorical class that may have contained students with ID and had at least one with autism.  (AR 2149 l. 20 – 2153 l. 18.)  Yet CPS's report did not even address the possibility that B.G.'s IQ was now in the intellectually disabled range; instead, it left the impression to any knowledgeable reader that he might or might not be, and if not ID was quite close.   The IHO credited Cintron's testimony that she had appropriately ruled out ID because some subtest scores were almost average and because IQ test drops are characteristic of ED and LD, not ID.  However, PSY2 conceded that with an IQ score of 71 and an even lower adaptive skills score of 59, intellectual disability was a possibility.  The IHO ignored Dr. Goldstein's testimony that across-the-board deficient IQ scores are not needed for an ID diagnosis (AR 3372 l. 15 – 3373 l.10), as well as his observation that that B.G.'s medical problems—which had included chronic and acute hypoxia—might have depressed IQ.

C. The IHO wrongly excused some of CPS'S clear failures with respect to academic evaluation and overlooked others.

    1. *The IHO let CPS give up rather than bringing in an assessor who could test academic skills and processing abilities or even try changing rooms.*

Cintron did not find someone else to do academic and processing testing, even though the OT, SLP, PT, AT assessor and past and former teachers managed to test B.G. When Cintron could not get B.G. to cooperate for IQ testing, Coelho was able to complete it in two sessions on one day. However, Coelho was going on maternity leave, and said her "" were obstacles to her doing further evaluation. Though time constraints do not excuse inadequate assessments, *CPS*, 110 LRP 51160 (SEA 2010), no one else was summoned. Cintron was not even willing to try testing B.G. in a different room. (AR 2356 ll. 5- 12.)

    2. *CPS mishandled reading assessment in numerous respects and failed to share information it had gathered; the IHO was unmoved.*

        i. CPS did minimal reading assessment and misinterpreted it; the hearing officer saw no problem.

Cintron reported vaguely that B.G. was overall a "functioning non-reader" and misinterpreted the sole instrument she used to exaggerate his command of letter sounds and dismiss the existence of his small sight word vocabulary. She treated a norm-referenced test sampling some letters and a few sounds and words (AR 684, AR 1522.) as a knowledge inventory, inferring that B.G. "demonstrated knowledge of the letters of the alphabet and sounds" (AR 685, 691) but was "unable to read basic sight words" (AR 691). Those claims were put in his IEP (AR 775 & 778), alongside contrary teacher reports (AR 758, 764.)

        ii. Cintron and the IHO disregarded other information about reading.

Ms. Cintron ignored Gorak's report in May 2014 that B.G. was at the 1.9 level in "reading recognition" (AR 1617) and was working on and reading some sight words, some short vowel sounds, and some one syllable words (AR 1614), as well as Dr. Obialor's formal and informal

reading evaluations (AR 1056; 1288; 1580; AR 2429 ll. 5-7; AR 2344 ll. 14-24).

      iii. The IHO excused Ms. Cintron's generic, useless reading recommendation.

The assessment's recommendation was for an "intensive phonics program;" she apparently meant to but did not include phonemic awareness, which she thought was part of phonics (AR 2373 l. 19 - l. 17- 2376 l. 21), though CPS forms for identifying learning disabilities make clear these are two different elements of science-based reading instruction and that LD assessments must ensure that students have had appropriate instruction in all of them (AR 726.) She did not report or opine as to whether instruction needed to be multisensory and disclaimed any role in recommending "programs," "minutes," staffing ratios, or whether past practices needed to change. (AR 2370 l. 18 – 2373 l. 17.)

      3. *CPS mishandled math assessment; the Hearing Officer overlooked problems.*

      i. Cintron misreported and misused information from her math testing.

Ms. Cintron reported math scores in a confusing, incomplete and contradictory fashion. She confused age and grade equivalents. (AR 684, 685.) Though her report said that B.G. "was able to solve basic computation without regrouping" (AR 691), she recommended only that B.G. would "benefit from review and practice of solving subtraction with regrouping (AR 692)." She reported basing this on item analysis from testing. (AR 2426 ll. 3-13.) However, her protocols showed B.G. had missed all regrouping problems—addition and subtraction. (AR 953-56.) He needed instruction, not just "review and practice," and it needed to include addition as well.

      ii. Cintron and the IHO disregarded supplementary information on math.

Though Ms. Cintron saw her math testing as unreliable (AR 684), there is no indication that she inquired about classroom performance. She disregarded Gorak's testing indicating B.G.'s math was at the late 5th grade level (AR 1617) and claimed that standardized testing by his new teacher (AR 699, 1051-1098) was "not part of the assessment" (AR 2429 ll. 5-11) and that she

had not relied on it (AR 2344 ll. 14-24.)  Cintron did not assess math fluency and was unaware

of Dr. Obialor's attempt to assess in this area (AR 741); though she would have wanted to know

about this and other academic testing, she did not. (AR 2354 l. 22–2355 l. 9; 2341 l. 5– 2344 l. 24.)

           iii.  Cintron did not mention or analyze long-term stagnation in math scores.

Ms. Cintron failed to point out that if her scores were correct, B.G.--who had entered

special education at or near grade level in math--had learned almost nothing since and was now

far behind.  Lack of progress could be inferred from her report (calculation skills in 2009 and

2014 were at 2nd grade level (AR 682 & 684 respectively), but was not mentioned or analyzed.

The IHO excused that omission as well as the psychologist's failure to discuss whether B.G.'s

problems in math—his relative strength and a key foundation for his goal of becoming a

mechanic--stemmed from a learning disability or from lack of instruction, overreliance on

calculators, or overall demoralization.

        4.  *The IHO wrongly excused CPS's failure to assess writing and recommendation of art and scribe services as alternatives.*

Ms. Cintron reported attempting the "written expression" portion of the KTEA, but said

that because B.G. is a "non-reader," he was "unable to respond to either tasks (sic)."  (AR 684.)

Written expression starts with name-writing, tracing and copying (AR 924), which are well

within B.G.'s skill set.  (AR 695.)  Cintron did not obtain a writing sample or check what B.G.

wrote with the AT assessor.  (AR 1336.)  Coelho had collected information about writing (AR

1481) but it was in the Vineland, scores and items from which were not reported.  Cintron had no

suggestions for teaching B.G. to write.  Her sole recommendations for "written expression" were

that "B.G. could benefit from being allowed to use art to express him-self (sic)" and that he

would "benefit from having written work scripted when possible."  (AR 692.)  "Scripting" did

not mean explicit, detailed instruction but assigning a scribe.  (AR 2426 l. 21 – 2427 l. 11.)

5. *The IHO ignored CPS's failure to assess in science and social studies.*

CPS skipped parts of testing batteries designed gauge science and social studies knowledge. Not surprisingly, the resulting IEP was vague. (AR 776, 778.)

D. <u>The IHO allowed CPS to attribute problems to emotional disability without checking processing/LD concerns.</u>

1. *CPS did very little processing evaluation and ignored results.*

Cintron apparently tried to test only phonological processing (AR 2354 ll. 3- 2356 l. 4; AR 1517-60), for which she deemed B.G.'s very low score unreliable. (AR 684.) She did not assess its plausibility or explain what it meant, and testified that she had expected the SLP to address language processing foundations for literacy (AR 2375 l. 12 – 2377 l. 2). She did not know whether memory was related to any of his suspected disabilities. (AR 2431 ll. 6 – 15.)

2. *The IHO improperly excused the assessors' decision to set aside without analysis B.G.'s existing eligibility based on a Specific Learning Disablity.*

The existence, scope and nature of B.G.'s previously identified specific learning disability should have been considered as it was relevant to educational placement and interventions. CFR § 300.304(c)(7). Coelho saw B.G. as a student with a learning disability, but her opinion was not reflected in CPS's report. The IHO asserted that the IEP team determined B.G. was eligible as SLD "[b]ased on [PSY1's] report," referring to documents and testimony which said nothing of the kind. (AR 20 ¶ 40; AR 2345 l. 21 – 2348 l. 13.) Fortunately, LD boxes were checked and lines were signed (AR 725-28, 730) but assessments provided confirmation and no information about its scope, nature or what to do about it. Elsewhere, the IEP undercut the LD label, asserting vis a vis reading, that B.G. "tends to learn easily and has the aptitude to learn fast when he is willing." S-3(1) at 85. Nothing in assessments would point administrators who do actual school assignments to a place like Acacia, where B.G. was at the time of hearing—a school designed for students with LD and ADHD featuring low staffing ratios and highly specialized

16

instruction and assistive technology.  *CPS Case 2009-0318*, 109 LRP 72742, pp. 8, 13-14 (2009).

3.  *The IHO wrongly excused CPS's failure to assess for ADHD.*

In fall 2014,  B.G.'s former teacher rated him on the BASC-2 in the 99th percentiles for hyperactivity and inattention and he rated himself in the 97th in both areas.  His mother gave more mixed answers, but hyperactivity was in the 67th percentile and inattention was in the 92nd percentile.   This information was consistent with his initial assessment, with IEPs, with teacher reports, and with information being turned up in the current assessment by the OT (AR 2955 l. 7 – 2961 l. 2) and social worker (AR 2117 ll. 19-24; 2118 ll 1-11).  CPS had not evaluated for ADHD during B.G.'s first triennial in 2012, but summarily withdrew the ADHD concept: "During the initial evaluation, concerns regarding ADHD symptomatology were observed by the staff.  During this evaluation, these behaviors were no longer apparent."  (AR 1789.)  Instead, staff blamed B.G., saying progress was "impacted by his lack of motivation and not investing himself in the learning process." (AR 1789).   In 2014, CPS ignored this area of probable disability even more completely, not considering possible OHI eligibility or whether attention problems were a processing deficit relevant to LD eligibility.  At hearing, Cintron attributed attention and hyperactivity scores in the 99th percentile to depression even though the BASC-2 groups items to yield separate measures of attention, hyperactivity and mood and reported that "I found him more to be noncompliant and defiant" and "didn't notice hyperactivity or inattentiveness."  (AR 2440 ll. 2-14.)

The IHO found there was no basis for CPS to suspect ADHD as an area of disability or assess in areas related to it. She noted that psychologists did not consider BASC-2 scores "in isolation for attention problems"  (AR 13, #19 (PSY2),  but ignored corroborating information from the OT, social worker, new teacher (AR 1101-02).  She also ignored CPS's failure to test directly for ability to concentrate on tasks, retrieval, memory and executive functioning, all of

17

which are related to ADHD.  (AR 3382 l. 18 -  3391 l. 13.)  The IHO found that student "has never received a medical or educational diagnosis of ADHD."  (AR 22, ¶ 54.)  The absence of a physician's diagnosis did not excuse the District's failure to assess, and the IHO's theory that there had been no "educational diagnosis" is irrelevant, as assessors needed to look at the information they and their colleagues were now turning up, and also understates the focus in 2009 on ADHD as a source of problems and area for medical follow up (AR 1887, 1889) as well as later reports in that vein.  (AR 1793-94.)

     E.  <u>The IHO wrongly excused CPS's failure to report very low adaptive skills scores.</u>

Coelho gave the Vineland by having B.G.'s former teacher rate adaptive skills.  (AR 2526 ll. 3-5.)  Daily living skills, communication and social ratings put B.G. below the 1st percentile with age equivalents ranging from under 3 to 8.5 years, consistent with intellectual disability.  (AR 1514-15.)  The hearing officer acknowledged PSY2's view that the scores should have been reported (AR 60), but excused PSY1's failure to do so on the grounds that she was "unaware of this assessment."  (AR 14-15, #16; AR 60.)  This would be no excuse, and does not appear true.  Though Cintron denied knowing about the Vineland (AR 2416 l. 10 – 2419 l. 16), her report contained Gorak's comments from it, complete with spelling "savvy" "savy."  She seemed to attribute them to his current, not former, teacher (AR 3393 l. 21–3394 l. 9), though she used the pronouns "Hhe (sic)" and "it."  (Compare AR 1491 (protocol) to AR 683 (report).)

Cintron tried to defend omitting low scores by claiming that CPS does not even "check daily living skills" except for students who have intellectual disability and autism.  (AR 2417 l. 11 – 2419 l. 16; AR 2437 ll. 1 - 16.)  If true, this flatly violates 34 CFR § 300.304(c)(6), which requires evaluations "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified."  B.G.'s May 2014 IEP transition section had noted independent

living skill needs: that he "will need to obtain skills to take care of his own diet, hygiene, and transport himself to a job." (AR 1646.) Medical providers had documented that he was "malodorous and visibly dirty." (AR 1705.) Dr. Goldstein testified that assessors cannot simply leave out information they have gathered. (AR 3392 l. 1 – 3396 l. 10.) The IHO brushed all this aside, disposing of the omission or suppression of Vineland scores by accepting PSY1's claim that she was unaware of the report she had quoted, and saying that she "does not believe" that "every possible assessment tool" must be completed or "every assessment performed must be included in the final evaluation report" "in order for the evaluation itself to be inappropriate." (AR 60.) For this student, adaptive skills were the assessment plan (AR 664), and rightly so. Scores required reporting and analysis.

F. Even in social-emotional analysis—the part of the assessment that CPS went to the core of B.G.'s present predicament, the District failed.

1. *CPS's assessment failed to distinguish between grief and emotional disability.*

Though conceding that grief would not qualify a student for special education, the assessors failed to consider whether B.G. had a level or duration of depression that was atypical for a student who had recently lost his father. Though the IHO credited Ms. Cintron's theory that a "gradual emotional disability" had depressed IQ scores, the report did not contain any such theory or evidence for it, treated B.G.'s mood as a reflection of his father's death, and relied heavily on input from a teacher who had last worked with B.G. right after his father's death.

2. *CPS conveyed reports from BASC-2 rating scales without reporting, as required, that certain results had to be viewed with "extreme caution" because of B.G.'s former teacher's very negative ratings; the IHO misunderstood testimony, decided the error did not matter, and failed to see the bearing of this assessment on B.G.'s relationship with his former teacher.*

Cintron reported "cautions" for B.G.'s BASC-2 but not for his teacher (AR 687-91), and testified she had not noticed the latter. (AR 2367 ll. 11-18.) Both psychologists initially testified

that high "F scores" on the BASC-2 rating of B.G. refer to inconsistent answers, which Cintron

and the IHO called "false positives." (AR 16, ¶ 31; AR 1931; AR 2364 l. 16 – 2367 l. 18; AR

2368 l. 20 – 2370 l. 1; AR 2495 l. 18 – 2498 l. 5.) Under cross-examination, they realized that

they had been confused and that "F" scores meant nearly the opposite—that a rater's views are

unusually extreme in a single direction. (AR 2365 l. 8 – 2367 l. 18 (Cintron.) The hearing

officer accepted their first theory, ignored their corrections, and decided that despite the

concession that the score should have been reported (AR 2369 l. 19 – 2370 l. 1), "failing to

report the "f score" did not invalidate the test results themselves." (AR 62-63.) Though failure

to report "F scores" (AR 1502) is often a factor in IEE grants, e.g. *CPS*, *Case 2014-0157*, 14

LRP 44696, pp. 11-12 (SEA IL 2014), the IHO misunderstood them and did not see a problem.

Nor did she realize they supported Goldstein's impression that there was tension between B.G.

and his former teacher. (AR 23 ¶ 57; AR 3375 l. 11 - 3376 l. 20.)

       3. *The IHO ignored nonreporting of another BASC-2 "response pattern" caution.*

Ms. Cintron admitted she should have reported a "response pattern" with a "high"

"caution" level. (AR 2368 l. 20 – 2369 l. 10.) No one explained this error or its significance.

**II.    CPS's speech and language assessment was inappropriate.**

In early fall 2014, over five years into special education, with staff having long recognized

language deficits (*e.g.* AR 1889), B.G. had his first-ever speech/language evaluation. It

identified moderate deficits in receptive vocabulary and pragmatics and mild deficits in two of

the other three subtests given. (AR 670). Protocols disappeared. (AR 2647 l. 23 – 2650 l. 3.)

The assessment was minimal, inconclusive, and ignored the academic impact of language

deficits—their connection to reading and writing and implications for B.G.'s ability to access

instruction auditorily and convey knowledge orally.

A. CPS did not meet its burden of production that instruments used were fair as a gauge of B.G.'s language and obviated the need for Spanish language testing.

The SLP knew the CASL had been normed on English proficient students and did not know whether B.G. was one. (AR 2757 l. 7 – 2758 l. 5.) She knew that B.G. was receiving bilingual services (AR 669). She saw an aide address him in Spanish. (AR 669.)

B. The IHO wrongly found it insignificant CPS that lost protocols and ignored its failure to offer even conclusory testimony that tests had been properly administered.

The District's loss of protocols made it difficult or impossible impossible to meet its burden of proof. *Cf. McKinney Indep. Sch. Dist.*, 58 IDELR 157, 59 IDELR 261 (E.D. Texas 2012) (destruction of protocols among reasons for IEE order). CPS's assessor defended her assessment as "valid" and "comprehensive," but did not testify that she had used tests per its publishers' instructions. (AR 2647 l. 23 – 2650 l. 23.) She indicated that it had "maybe been a long time since [she'd] read the entire [CASL] manual." (AR 2700 l. 23 – 2701 l. 3.) She reported not understanding the terms "dyslexia," "encoding," and "decoding," which the manual uses in the test overview (Exh. B to Motion to Supplement Record.) Reviewing protocols was particularly important in this case given the improbable results: though B.G.'s receptive and expressive vocabulary scores were in the 2nd and 5th percentile, the assessor claimed that he was "normal" in "meaning from context." (AR 2696 l. 17 – 2698 l. 10.) The IHO ignored the SLP's failure even to allege compliance with the manual and held that losing the protocols did not "invalidate the scores and report." (AR 28 ¶ 81.) She ignored the real questions, which were whether CPS could meet its burden of proof without protocols, and whether it had.

C. The IHO ignored the SLP's failure to gather information..

1. *The SLP went into the assessment suspecting only pragmatic problems, overlooking information readily available through interviews and documents that B.G.'s difficulties were far broader.*

She did not check with B.G.'s mother about early milestones, native language abilities, or

language exposure and use at home. (AR ) She talked with B.G.'s new teacher, who said he did not speak much but she could understand him when he did, but not Gorak, who had long linked his literacy problems to language issues ( ), and in September 2014 reported extremely limited communication abilities. (AR 1474-75, 1478-81). Though the SLP testified that her concern was solely with "academic" language, the portion of her report describing the areas impacted referred solely to social interactions and said absolutely nothing about the academic impact of what she terms B.G.'s "mild-moderate language delay." (AR 671.) The SLP did not engage in any academic conversations with B.G. or speak with teachers about his ability or not to have such discussions. No one used parts of academic batteries that measure language.

     D.  <u>The IHO neither thought the SLP needed to understand her field's connection to literacy nor that CPS had to assign anyone to B.G.'s case who did.</u>

Though the school psychologist had been anticipating input from the SLP on the language underpinnings for reading AR 2375 l. 12 – 2377 l. 2), the SLP explained that though literacy is within the scope of practice for school-based SLPs nationally, CPS has separate "reading specialists." (AR 2671 l.10 – 2772 l. 22.) Rather than realizing it was a problem that no one CPS had assigned to assess this eighth grade nonreader could or would not analyze problems in this area, the IHO found that it supported the SLP's credibility that she was "reluctan[t] to give opinions on subject areas outside of her area of expertise." (AR 30 ¶ 88.)

     E.  <u>The SLP failed to assess expressive language.</u>

The SLP did not assess B.G.'s expressive language. (AR 3319 ll. 21-23.) She did not check sentence length. The hearing officer allowed this approach on the theory that for older children "the MLU (mean length of utterance) is not very helpful because older students can speak using a lot of words." (AR 29, ¶ 83.) That missed the point: that B.G. was speaking in very short sentences despite his age. The IHO gave Martin credit for records review (AR 24, ¶

61, AR 65) but ignored her failure to notice expressions of concern about expressive language such as Gorak's attribution of writing problems to expressive language weaknesses (AR 1617) and his reference to word retrieval problems and associated "grunting" (AR 1729.)

F. The SLP's failure to assess receptive language with the exception of single word vocabulary and pragmatics left the IEP team with no idea as to how, if at all, grade level concepts would need to be modified if presented orally.

The SLP did not suspect receptive language problems, apparently because she had failed to notice indications of those in her records review as well—for instance, indications that B.G. needed simplified instructions, much repetition, visual demonstrations and checks for understanding. (AR 1626.) Yet when she tested receptive vocabulary with two measures, B.G. had "moderate" deficits." (AR670.) She found "mild" deficits in grammaticality judgment and nonliteral language, and but did not propose any goals or accommodations to address them. (AR 670-71.) She had no idea how much material would need to be simplified in the classroom, and made no effort to find out. The IEP team which relied on her also had no idea: they created a goal for B.G. to answer questions about text read out loud at his "instructional level" (AR 763) without indicating what that was at baseline or should be by year's end. Fortunately, they did not follow the recommendations of the AT assessor, who thought that his listening comprehension was not much better than his (virtually nonexistent) reading.

G. CPS did not explain whether B.G. had a language disorder; this mattered.

The SLP did not even address in her report whether B.G. had a language disorder, even though that would affect special education classification and the appropriateness of verbal IQ measures. (AR 2492 ll. 1-20.) The SLP did not reveal until hearing her seeming assumption that he did not and had low vocabulary because he could not read. (AR 2738 l. 11 – 2749 l. 7.)

### III. CPS's Physical Therapy Evaluation was incomplete.

A. <u>The PT failed to address posture concerns.</u>

The PT dismissed posture concerns that the OT expected her to analyze (AR 694)  falling far short of the role of school-based PT in Illinois to address the impact of posture on comfort and attention.  ((AR 32  ¶ 97; AR 3025 l. 14 – 3030 l. 11; AR 3054 l. 16 - 3056 l. 12; AR 1894.)

B. <u>The PT noted poor endurance, speed and heavy sweating with mild exercise but called for adaptations, not remediation.</u>

B.G. covered about half the normal distance during a 6 minute walking test, needed water and a break in the middle, and was sweating; though checking blood pressure before and after walking is part of the protocol, this is not done at school.  (AR 3031 l. 12 -  3037 l. 12.)  B.G. took more than twice the average time to go up and down stairs.  (AR 3037 l.  3 – 3038 l. 11.)

The IHO nonetheless endorsed the PT's theory that biking .6 miles per day to and from school was a "significant" distance (AR 33, ¶ 102) and that  B.G. was "participating well" in PE and showing "strong performance with gross motor skills and sports activities," and "was receiving curriculum modifications and accommodations as needed for safe and appropriate participation (AR 32  ¶ 99; AR 31  ¶ 103), ignoring the PT's admissions that she did not know how much exercise he actually got in PE, how much he resorted to doing activities "while seated" or taking the "rests" that were permitted, whether he was capable of exercising safely on his own, the PT's failure to test strength, and the team's failure to assess B.G.'s theoretical knowledge, skill levels, endurance, speed or levels of participation or modification in PE activities.  Coelho and Gorak omitted motor portions of the Vineland which would have clarified the physical capabilities of this extremely unhealthy student.  (AR 1474.)

The PT report projected that existing drastic modifications would continue as needed, with B.G. engaging in physical activities "as tolerated," on an ad hoc basis, with no consideration of

whether PT was needed to improve B.G.'s ability to participate in the PE curriculum and other physical activities. Currently, modifications were being left up to B.G.'s teacher and mainly to him to work out (AR 3042 l. 15 – 3045 l. 2). PT explained that she was not concerned about speed and endurance because distances are short on campus and B.G. could take breaks; her focus was entirely on modification, not remediation. Though the IHO thought PT findings "were used to create the October 9, 2014 IEP," and the IEP recites the PT's findings that B.G. needed unspecified "accommodations and/or modifications" (AR 724), the IEP's ongoing services section indicates that B.G. does not require accommodations or modifications in PE. (AR 746.)

C. The PT failed to consider how B.G.'s low speed, lack of endurance and heavy sweating with mild exertion would affect his transition opportunities.

The IHO relied on CPS's abstract distinction between "medical" and "educational" therapy (AR 31 ¶ 96) while ignoring the PT's failure to look concretely at how B.G.'s physical condition and resulting gross motor limitations affected his prospects for finding, doing or keeping a job, even though transition planning was one of the reasons for the upcoming IEP meeting. (AR 738.) Illinois has created a practice manual that governs the role of PTs and OTs in schools. (AR 3061 ll. 10 – 19.) That guide calls for PTs to address vocationally related needs (AR 1891, 1894); B.G.'s assessor did not. (AR 3070 ll. 6-8; AR 3072 ll. 11 - 24.) She explained that PTs in CPS "usually" become involved in vocational activities "in the high school setting" "as the parent and the team come up with a transition plan." (AR 3076 l. 24 – 3077 l. 17.) Illinois law requires transition planning to start at age 14, and B.G's eighth grade IEP contained a transition plan. However, like other assessors, the PT did not consider what B.G. would need to achieve in order to realize his ambition to become an auto mechanic or offer any basis other than there there is "still significant time within the District" for declining to address PT needs related to work before high school. (AR 3077 l. 23 – 3078 l. 24.)

D.  The IHO mistakenly found that the PT had ruled out pain..

Though the hearing officer acknowledged that the PT was not aware the student had pain and would not ask about it unless informed, she went on to claim that "[d]uring her evaluation, [the PT] asked the Student how he was doing (re: pain) and he did not report anything."  (AR 34 ¶ 105.)   The IHO was right the first time. Had information about pain been communicated to the PT, she would have inquired; it did not come up. (AR 3014 l. 9 – 3025 l. 13.)

## IV.  B.G.'s OT Evaluation ignored important areas of need.

### A.  The OT failed to investigate sufficiently daily living skills.

The OT declared B.G.'s school-related daily living skills insofar adequate based on self-report and minimal observations (AR 2891 l. 17 – 2892 l. 11). She was unaware of concerns about hygiene and other daily living abilities (AR 2914 l. 13 – 2917 l. 8) though they had been documented, in some cases for years.  AR 1614, 1618; 1777; 1763.)

### B.  The OT insufficiently assessed visual processing.

B.G.'s former teacher's view that a "visual perceptive disorder" might be the primary factor in his reading problems (AR 1729) and his first assessment had purported to rule out auditory discrimination problems.  (AR 1889.)  OT assessment might go far to explaining B.G's problems.  But the OT did not mention any link between a visual closure test on which B.G. scored very low and his inability to read.  She acknowledged a possible connection at hearing, but said she was not an expert in that area.  (AR 2929 l. 24 – 2933 l. 3; AR 2934 l. 7 – 2943 l. 21.)  She reported discounting this result because she thought that B.G. had "shut down" because the task was "challenging." (AR 2896 l. 5 – 2897 l. 4.)  It makes little sense to give up on assessing an area that a student finds difficult, which could relate to their main educational problem, and Goldstein explained why there should have been follow up testing to determine whether visual processing deficits were contributing to B.G.'s reading problems.  The IHO

dismissed his views—even though he tests visual perception as a psychologist and does understand its connection to reading—based on an incorrect understanding of what is required of expert witnesses.  (AR 40  ¶¶  131-35; AR 68-69.)

**V.    CPS's Nursing Evaluation was incomplete and misleading.**

The school nurse had been involved with B.G. for over five years but omitted critical personal knowledge and perceptions.  She came in with a too-narrow view of her role and did not fulfill even that.  The IHO ignored or excused all problems, in part based on clear factual errors.

A.  The nurse's report was misleading as to respiratory issues.

The nurse reported orders that B.G. use "BiPAP with oxygen at night/sleep" (AR 679) but failed to mention that she knew that B.G. was failing to follow breathing support recommendations at home; she knew this could affect school performance but not whether it was life-threatening.   (AR 3273 l. 19 – 3276 l. 17).  She reported that he had "required" oxygen at school (AR 677) but was no longer under orders to use oxygen (AR 679) without revealing that he had refused to use oxygen when he had been under orders to do so at school.  (AR 3294 ll. 2-24; AR 3303 l. 15 – 3304 l. 24.)

B.  The nurse ignored connections between health and behavior.

B.G.'s behavior plan always stated in conclusory terms that  his medical problems as relevant to his learning and behavior. (AR 1200, 1757, 1648.)  Ms. Frederickson did not report that fatigue could be a factor or assess how alertness at school might be improved through blood sugar management, collaboration to improve night-time sleep, or any other technique.

C.  The nurse did not report frequent medical complaints at school or her view that they were escape-motivated.

Only at hearing did the nurse acknowledged B.G.'s medical complaints at school, which were "clinically significant" in the BASC-2 scale for "somatization."  (AR 688.)  She was

skeptical about "symptoms" including reported tiredness (AR 3275 l. 23 – 3276 l. 6) and thought he "would misuse" his conditions "to avoid undesirable tasks" and "undesirable classes." (AR 3288 l. 2 – 3290 l. 8.) Rather than reporting these significant concerns, she claimed she "would have called" the new school nurse when he moved to high school in a year. (AR 3289 ll. 7-10.)

D. Ms. Frederickson did not analyze B.G.'s attendance problems.

Noting that B.G. had poor attendance during the previous year, and that "factors for school attendance sometimes include health-related matters," the nurse "wanted to make sure that his attendance wasn't due to any health-related issues." (AR 3208 l. 17 3209 l. 1.) However, she did very little to inquire and did not find out. (AR 3251 l. 21 - 3253 l. 22.)

E. The nurse ignored ear issues, at least one of them current.

The nurse had previously reported chronic ear infections (AR 1885), had been in charge of monitoring related to wax impaction (AR 1885) and did not know whether impaction was intermittent or present when she assessed (AR 3244 l. 22 – 3245 l. 1). Goldstein testified that wax can be a recurring problem warranted monitoring and treatment, (AR 3170 ll. 1-15.) Other current assessors reported "mild hearing loss" without making clear whether it was continuing. (AR 1277, 1293.) Yet the ), the IHO saw no problem in "presum[ing]" wax impaction "was resolved or being treated." (AR 43 ¶ 150.) Though the nurse acknowledged that suspected middle ear dysfunction would have been relevant for her evaluation (AR 3245 ll. 2-20), the IHO noted that the nurse was "not aware of the Student's suspected middle ear dysfunction because she was not present for the audiologist's report," treating this as a sufficient explanation rather than a problem in its own right. "(AR 43 ¶ 151) Though all the nurse wrote about hearing was that B.G. had passed a single screening in 2013 (AR 3229, l. 11 – 3232 l. 9), this morphed in the decision into having "passed recent hearing screenings." (AR 70.)

F. The nurse omitted her own services and plans to change them.

Frederickson's report did not describe her services, though the previous IEP explains she was meeting with B.G. 15 minutes per week to address dietary needs through understanding food labels. (AR 1676; 1678.) The report said nothing about how these services had gone and indicated merely that "[n]ursing services will continue for this student." Initially, the nurse thought she had written that consultative services with B.G. should continue (AR 3214) and claimed that was her plan (AR 3248 ll. 1-7.) Looking at the IEP, she revised this to say she had not been recommending services with B.G. (AR 3271 ll. 3-14.) Though the nurse knew that B.G.'s medical care was divided and in flux, thought providers hard to reach had "no idea" if they shared records with each other (AR 3226 ll. 5-19; 3276 l. 8 – 3277 l. 10), she recommended just 15 minutes per quarter of consulting with "family and/or medical team." (AR 751.) Though she knew B.G. was medically noncompliant with his mother (AR 3274 l. 1– 3275 l. 15), she dropped talking with him rather than finding a way to work with him that did not depend on reading skills he lacked. (AR 3271 ll. 1 – 14; 3248 l. 1 – 11.)

G. The nurse ignored ADHD concerns.

The nurse acknowledged that if she had seen ADHD as a possible area of disability, she would have checked with J.A.G. about medical treatment or lack thereof for ADHD. (AR 3232 l. 12 – 3234 l. 6.) She explained that though she was part of the initial team that stressed ADHD concerns and recommended follow up (AR 1887-89), and was herself charged with monitoring attention (1883-85), her role had nothing to do with ADHD and it had not occurred to her to suspect it now. (AR 3222 l. 9 – 3223 l. 12.) The IHO was satisfied. (AR 152, ¶¶ 152-54.)

H. No one brought depression to the nurse's attention.

The only psychiatric diagnosis referenced in the nursing assessment was "intermittent explosive disorder," which she twice wrote was diagnosed in November 2014 (after her report).

(AR 677-78), though the hospital sent records in November 2013.  (AR 1713-18.)  Ms.
Frederickson did not become aware of information being gathered by other assessors regarding
depression that would have affected her assessment and affected her recommendations.    (AR
3217 l. 20– 3219 l. 4; AR 3311 ll. 13-17.)

   I. <u>The nurse did not update B.G.'s family medical history.</u>

  The nurse referred the reader to her 2009 report for "family history" (AR 676; 1884.)   She
testified that if a family member had problems similar to those a student was having, that would
"belong in a school nursing report" "if the family shared it."  She acknowledged having known
that B.G.'s father had been on dialysis and having hospital records (AR 3220 l. 1 – 3221 l. 15),
which reflected kidney team involvement. (AR 1690-91.)

   J. <u>The nurse mentioned diabetes but not its management.</u>

  The nurse indicated that a school nurse would become involved with managing prediabetic
symptoms  "[i]f the opportunity arises and the information comes to light," and that now that
B.G. had progressed to full-blown diabetes, consultations might address diabetes "[i]f there were
concerns."  (AR 3307 l.  22 – 3308 l. 19.)  She did not investigate whether there were.

   K. <u>The nurse failed to gather relevant information.</u>

  The IHO appeared to credit the nurse's testimony that she needed a list of prescriptions and
that despite two requests to this mother of four, she did not get it.  (AR 42 ¶ 143; AR 3209 l. 15 –
3210 l. 13; AR 3258 l. 10 – 3259 l. 9.)  She acknowledged not trying to get records via a release
or seeing if there was one on file (AR 3226 l. 20 – 3227 l. 11; 3259 ll. 11-18.)  There was no
evidence that she had asked for the name of the pharmacy, which might have been better at
communicating medications and dosages than the parent or B.G.  She claimed that she had tried
to communicate with providers but had given up because they were unresponsive; however, it
turned out that some medical records they faxed to the school may not have been routed to her.

(AR 3265 l. 23 – 3268 l. 12; AR 3310 ll. 4 – 24.)   Both hospitals had faxed information to

Armstrong Elementary.   (AR 1689-93; 1713-18.)  A Lurie doctor had faxed the school asking to

be paged and supplying a signed release for communication.  (AR 1709-11.)   Despite ample

evidence that medical providers had sent information and tried to contact B.G.'s school (AR

1689-93; 1701-18; 1720-25) the IHO created a scenario far more extreme than the nurse's

testimony (e.g. AR 3260 l. 20 – 3261 l. 15) claiming all she could get despite phoning, emailing

and faxing was a form allowing unrestricted activities at school.   (AR 43 ¶ 149; AR 819.)

**IX.   The District's social work assessment was inappropriate.**

    A.  <u>CPS's social worker did not try to understand B.G.'s school experience and the IHO
did not realize she needed to.</u>

Districts cannot ignore "emotional difficulties associated with schooling." *Camp Hill SD*,

38 IDELR 113 (Pa. SEA 2002).   .   The social worker conceded that it was "relevant to a social

work assessment to know what kinds of instruction a student with a learning disability had been

getting academically over the years," and claimed to have "indicated the services and support

that he received in the record review."  (AR 2149 ll. 11-19.)  However, other than "minutes" in

environments (   ), she reported, and knew virtually nothing – about class composition, size,

disabilities (AR 2149 l. 20 – 2153 l. 18.   The hearing officer barred as irrelevant a question

about peers' language levels.  (AR 2150 ll 13-19.)

    B.  <u>CPS's assessor failed to analyze the role of B.G.'s home and community
environments in affecting his failure to learn.</u>

405 ILCS 49/5 "requires all school districts to teach students to manage emotions and

behavior for both academic and life success."  CPS,  Case 2012-0246, 113 LRP 12570, p. 18

(ISBE 2013).  The bearing of this requirement on life outside school was elaborated in *Plainfield

Sch. Dist. 202,* 63 IDELR 145 (IL SEA 2014) (awarding IEEs where district evaluations not

comprehensive).  CPS's assessor failed to make a needed home visit.  She was not aware that

ISBE recommends including home visits in social work assessments.  (AR 2126 ll. 1-3.)  When shown that ISBE's manual for school social work services notes that "[t]e home visit is an important element in assessing the student's environment (1903-04)," she explained that CPS uses this "as a tool to support, but this is not our protocol."  (AR 2781 l. 16 – 2782 l. 2.)  She said she never goes to homes as part of school social work evaluations (AR 2125 l. 13 – 24), though she later said she occasionally visits homes, apparently for other reasons.  (AR 2137 ll. 19-20; 2138 l. 22 -2140 l. 21.)   Though the IHO found the social worker did not need to see B.G.'s home because she deemed his mother a reliable informant (AR 48 ¶ 169), in fact the social worker said she had "no reason not to" see her as reliable.  (AR 2126 ll. 9-15.)

   The social worker did not even try to understand what was happening with respect to the most obvious example of home-education linkages: why B.G. was not doing homework.  (AR 2208 l. 9 – 2209 l. 3.), a long-time area of concern.  (AR 1739.)   She did not know whether what was being sent home was within his capability.  She knew B.G. considered his apartment small, but did not know how small it was.  (AR 2126 ll. 16 – 22.)   She didn't know whether absence of parent support was a problem nor did she ask B.G.'s mother about homework.  The social worker did not attempt to understand environmental dynamics potentially contributing to B.G.'s morbid obesity, the hearing officer sustained relevance objections to questions in this area.  (AR 2140 l. 22 – AR 2146 l. 17.)  She did not talk to B.G. about sleep even though he had sleep apnea and was not using his "machine."  (AR 2182 l. 18 – 2183 l. 5.)  The IHO ignored  concrete home/school connections as well as Illinois's recognition that schools are supposed to prepare students for life beyond their doors.  She accepted without discussion CPS's theory that "the purpose of the school social work assessment is to determine the student's abilities and needs within the educational setting," and its theory that though ISBE has indicated that "the home visit is an important element in assessing the Student's environment," it is not "mandated."  (AR 70.)

C. <u>CPS social worker failed to provide a desperately needed functional analysis of B.G.'s counterproductive behaviors.</u>

Though the social worker purported to create a "behavior plan," she did so without the functional behavioral analysis" which is required to generate an effective plan. (AR 3321 l. 22 – 3325 l. 2.) Failure to include a necessary "functional behavior assessment" warranted an IEE in *CPS,* Case 2014-0157, p. 18, 114 LRP 44696 (ISBE 2014), and does here as well.

D. <u>The hearing officer ignored problems with social work recommendations.</u>

The assessor recommended increasing social work "minutes" since B.G. had gone downhill without knowing what was being done or whether it was helping. (AR 2200 l. 13 - 2203 l. 2.) She had not been alerted of "critical" BASC-2 items – that B.G. had been saying that he wanted to die or wished he were dead. (AR 992.) Though school social work time was geared to work on "self-esteem issues specifically with motivation towards academic success (AR 743), and the social worker testified that she would have assessed risk if she knew B.G. was making such comments (AR 2188 l. 21 – 2189 l. 11), the IHO blithely observed that "SW was able to use the information she obtained during her assessment to assist the IEP Team in determining the Student's eligibility for services and writing the Student's IEP." (AR 71-72.)

**X.     The District's Assistive Technology Evaluation was inappropriate.**

AT assessments should identify what if any AT devices and services a student needs to increase, maintain, or improve functional capabilities. 20 U.S.C. §§ 1401(a)(1), 1414(d)(3)(B).

A. <u>The AT Assessment expemplified lack of coordination, resulting in failures to recommend technology that the SLP'a findings implied would be useful.</u>

B.G.'s AT assessment was done at the beginning of the FIE process—with the assessor guessing unreliably as to needs—rather than at the end—taking into account full information. The AT assessor found that B.G.'s oral comprehension was little better than his virtually nonexistent reading ability, such that audio access to print would not help him. (AR 2052 ll. 5-

13.)  The IHO approved the determination that text to voice software would not work without commenting on the SLP's findings that except for single word vocabulary and misunderstanding some social communications B.G.s receptive language was mildly delayed to normal (AR 670), or on his classroom teacher's claim that comprehension was "close to grade level," perhaps based on his response to one passage.  (AR 1206; 1289-90.)  Similarly, the AT assessor concluded through her probe that B.G. could not write at all without letter-by-letter prompting and lacked letter-sound correspondences, but did not mention dictation technology.  At hearing, she rationalized this omission by saying that as a result of his "very low utterances," dictation technology would not work.   (AR 2014 l. 15 – AR 216 l. 5; AR 2017 ll. 9 -22; AR 2062 l. 20 – 2067 l. 2).  She explained that he is "limited in his expressive language," "responds in brief three or four word sentences," "often will respond to a statement in question form," and "[b]ecause he struggles with expressive language it is difficult for B.G. to progress with written expression." (AR 1587.)   The IHO accepted the decision not to recommend dictation technology as being "based upon the Student's abilities and individual needs" (AR 74) because "[i]t was not evident that this Student was able to say more than he could write" in that he "uses one word to three to four word utterances in his speech" (AR 55 ¶ 201).  This made no sense, since the AT assessor thought B.G. could say short sentences and could not write at all, and the IHO made no attempt to reconcile it with her simultaneous approval of a speech/language assessment which claimed B.G.'s expressive language was quite intact except for pragmatics.

      1.   *The assessment misstated B.G.'s existing access to AT.*

B.G.'s AT assessment falsely stated that B.G. was not using assistive technology (AR 1589) though his last IEP listed it (AR 1616, 1659) and Goldstein testified he had likely long overrelied on calculators.  (AR 3412 ll. 1-17; 3426 ll. 9-19.)  The assessor explained that this section was "populated" by the referral and that she had looked at math as no one had asked her

to  (AR 2011 l. 6 – 2012 l. 23; AR 2014 ll. 2-14.)

B.  <u>The AT report purported to foster access to "curriculum;" its author knew, but did not report, that the supports suggested would come nowhere close to that.</u>

The assessor acknowledged that the issue precipitating referral had been that "he couldn't access his curriculum for his area of need, which she defined as reading, language usage, and written expression (AR 1985 ll. 14-24), and that was the ostensible focus of her report.  (AR 712.)  It emerged at hearing that the "Talking Dictionary" recommendation was meant to allow B.G. to look up words in his environment one or two at a time; the assessor knew though she did not report that it would not work for reading text.  (AR 2061 l. 23 – 2062 l. 15.)  Despite her ostensible focus on curricular access, the assessor did not focus on how B.G. could be assisted in producing sustained written products or otherwise recording his ideas.  Instead of dictating, the assessor preferred for B.G. to use a combination of approaches that she thought that might, with a year of practice, let B.G., with the correct support and the correct settings," write "a couple sentences."  (AR 2018 l. 4 – 2020 . 13.)  Her report did not say that, and staff wrote a goal calling for far more.    768.

C.  <u>The AT assessor failed to examine supports for attention and organization.</u>

The AT assessor knew of technology that could help students with ADHD (AR 2071 ll. 3 – 13), and would have considered it had attention had been listed as a referral concern.  (AR 2075 l. 17 – 2088 l. 13.)  Actually, it was on the referral and, with identical words, in her report (AR 705, 708), albeit not in the "reason for the referral" section.  (AR 706.)

/s/ Maureen R. Graves
Counsel for Plaintiffs, B.G. et al.
May 2, 2016
Bar No. 6311493
Law Offices of Maureen Graves
1326 East Madison Park, Chicago, IL 60615 / (773) 966-4756