**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| B.G., by his next friend, J.A.G.,Individually and as Parent and Next Friend of B.G., | ) | No. 15 C 6372 |
| | ) | |
| | ) | Judge Virginia M. Kendall |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| City of Chicago School District 299, et al., | ) | |
| | ) | |
| Defendant. | | |

## MEMORANDUM AND OPINION

B.G. and his mother, J.A.G. appeal from an administrative ruling rendered by an Impartial Hearing Officer ("IHO") on March 23, 2015, following a special education due process hearing pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1401 *et seq.*  The IHO conducted the due process hearing and determined that B.G. was not entitled to public funding for Independent Education Evaluations (IEEs) in Psychology, Speech-Language, Physical Therapy, Occupational Therapy, Nursing, Social Work, and Assistive Technology. Plaintiffs also move to supplement the administrative record with five additional documents, including two IEEs obtained after the administrative hearing.

For the reasons outlined below, the Court affirms in part, and denies in part, Plaintiffs' Motion to Supplement the Record (Dkt. 48) and denies Plaintiffs' Motion for Judgment Reversing Administrative Decision.  (Dkt. 43.)

# I.    BACKGROUND

B.G. is a 16-year-old[1] student who qualifies for special education under the disability categories of emotional disability and specific learning disability. His mother, J.A.G. , speaks only Spanish and has four children including B.G. (Dkt. 1 at ¶ 14.) She has spent years advocating for B.G.and seeking assistance from the District on her son's behalf. (*Id.*) B.G. started school at George Armstrong International Studies Elementary, a Chicago Public School (CPS), in pre-Kindergarten and attended through the beginning of eighth grade.[2] (Dkt. 1 at ¶ 11.) He repeated first grade and entered second grade late as a child with a specific learning disability (SLD). (*Id.*) While at George Armstrong, the District placed B.G. in a self-contained special education classroom and he received specialized instruction and related services. (Dkt. 1-1 at 2.) Among those services, he received consultative services in the areas of social/emotional, health/medical, and speech/language. The District also had a Behavior Intervention Plan (BIP) for B.G. (Dkt. 1-1 at 3.)

B.G. had a significant attendance problem. During the 2012-2013 school year, B.G. was absent twenty-six days, and during the 2013-2014 school year, B.G. was absent for approximately sixty days. (AR 21.) His absences were due, at least in part, to his health issues as well as problems in his family. B.G.'s father died in April 2014, and shortly after, B.G. was hospitalized with diagnoses of morbid obesity, hypertension, severe obesity-related hypoxia syndrome, and Type 2 diabetes and obstructive sleep apnea. (Dkt. 1 at ¶ 15.) When he returned to school, B.G. had doctor's orders to use oxygen twice during the day. (Dkt. 1 at ¶ 15; AR 1692). During this same time period, Department of Children and Family Services (DCFS)

---

[1] The Court presumes B.G.'s age, based on his stated age of "almost 15 year old" at the time he filed his Complaint in July 2015. (Dkt. 1 at ¶ 11.)

[2] B.G. finished eighth grade as a CPS-placed student at a private therapeutic day school designed for students with specific learning disabilities. Upon filing the Complaint, B.G. was entering ninth grade in that program. (Dkt. 1 at ¶ 11; Dkt. 1-1 at 2.)

received a report that J.A.G. was unable to care for her children, and B.G. was sent to live with his god-mother. (AR 1692.) The record is unclear on when, exactly, B.G. returned to live with J.A.G.

On July 22, 2014, counsel for J.A.G. filed a request for a Due Process Hearing alleging violations of the Individuals with Disabilities Education Improvement Act of 2004 (IDEA) and Illinois law. (Dkt. 1 at ¶ 16; AR 4.) She asserted that the District had denied a "free appropriate public education" (FAPE) for B.G. and requested reevaluation and intensive academic and emotional support. (AR 289-305). The Illinois State Board of Education appointed a Hearing Officer on July 25, 2014.

Following mediation between the parties, in August 2014, the District moved B.G. to a classroom with a teacher who was familiar with multisensory approaches to teaching reading and writing for students with dyslexia, and the District also gave B.G. an aide. (Dkt. No. 1 at ¶ 17.) Plaintiffs allege that these steps were only taken "informally" because there was no formal agreement. (*Id*.) During the same month, the District began to assess B.G.'s educational needs, particularly in the areas of health, hearing, social emotional status, intelligence, academic skills, communication status, and fine and gross motor abilities. (*Id.* at ¶¶ 18, 21.) The assessments were reported to B.G.'s Individualized Education Program (IEP) team on October 9, 2014.

*IEP Meeting*

During the October 9, 2014 meeting, the IEP team developed a report based on the educators' assessments and the requests made by J.A.G. and counsel.[3] (*Id.* at ¶¶ 24-25.) In

---

[3] Members of B.G.'s IEP team who were present at the meeting included: Anna Vlahandreas (Case Manager); Anthony Orrico (District Representative); Uchenna Obialor (Special education teacher / transition representative); Jose Ramos (General Education Teacher / bilingual specialist); Yazmin Cintron (Evaluation Representative and psychologist); Judith Fredrickson (School Nurse); Yvonne Torres (interpreter/translator); Jennifer Aviles (Social worker); Joellyn Martin (speech-language pathologist); J.A.G.; and counsel for the District and Plaintiffs'. (AR 736.)

addition to a special learning disability that B.G. already had been labeled with, the IEP team determined that B.G. had an emotional disorder.

Dissatisfied with the District's evaluations, J.A.G. requested Independent Educational Evaluations, at public expense, in seven areas: psychology, speech-language, physical therapy, occupational therapy, nursing, social work, and assistive technology (the seven evaluations). (Dkt. 1 at ¶ 28.)  The District filed a request for a Due Process Hearing on October 22, 2014. (Dkt. 1-1 at 3.)  The administrative hearing followed beginning in February 2015.  (Dkt. 1-1 at 3.)

*Administrative Hearing*

Janet K. Maxwell-Wickett was the Hearing Officer ("IHO") appointed to the case on December 1, 2014.  On March 23, 2015, the IHO issued a Final Determination and Order that the District had met its burden in demonstrating that the seven evaluations were appropriate within the meaning of 34 C.F.R. § 300.304(c) (2006) and Plaintiffs were not entitled to IEEs at public expense. (AR 12; 73.)

The IHO found that each of the District's witnesses who assessed B.G. were qualified, and that their testimony was credible and persuasive.  (AR 21, 30, 35, 38, 40, 45, 51, 57.)  Each of the assessors testified that they knew B.G., many of them for years, and that they each reviewed his record in anticipation of their assessments.  Each of the assessors also interviewed B.G.'s teachers, and with the exception of the school nurse, each made classroom observations. (AR 16, 24-25, 32, 36, 46, 53.)  At the IEP meeting, the team discussed each assessment; J.A.G. and Plaintiffs' counsel did not express concerns with the results of the assessments at the meeting.  (*See, e.g.*, AR 2, 49-50).  The IHO's factual findings relating to the individual assessments are described below.

*Psychological Evaluation*

Two psychologists assessed B.G., Nicole Cintron and Yazmin Coehlo. Coehlo, the first psychologist who worked with B.G. has been employed by the District for three years as a school psychologist. (AR 12 ¶ 2.) She graduated from National Louis University with a Master's Degree in special education and holds an Illinois type 73 license as well as a bilingual certification in Spanish. (AR 12 ¶ 3.) Cintron, the second psychologist who worked with B.G., has been a lead psychologist with the District for the last eight years and has been employed by the District for ten years. Prior to becoming a psychologist, she was a first grade teacher for seven years and a special education teacher for three years. (AR 15 at ¶ 20.) Cintron holds Bachelor's and Master's Degrees in bilingual special education. (AR 16 ¶ 21.)

Coehlo administered two tests, the WISC-IV, along with the WISC-IV's ten core subtests on the WISC-IV, and the BASC-II. She used the test results to obtain a full scale IQ for B.G. (AR 13 at ¶ 5.) Coehlo left for maternity leave after administering these tests, and she shared the results with Cintron before leaving. (AR 13 ¶ 17.) When Cintron began working with B.G., she attempted to administer an additional test, the KTEA, to assess B.G.'s academic skills, but B.G. was uncooperative throughout the test, rendering those scores unreliable.[4] (AR 18 ¶ 33.)

At the hearing, Cintron testified about B.G.'s cultural and language background— that Spanish is spoken in the home, but B.G. is proficient in English, which she observed both in the classroom and in her communications with B.G. (AR 16 ¶ 25.) She also interviewed J.A.G., and noted that J.A.G. expressed concerns with B.G.'s "daily living and functional communication,"

---

[4]Plaintiffs question why Cintron "was not even willing to try testing B.G. in a different room." (Dkt. 43 at 13.) But nothing in the testimony indicated a lack of willingness on the part of the assessors. In the testimony Plaintiffs cite to, Cintron who was asked, "Q: did you consider doing the testing in a different site?" and she answered, "[n]o. We test in the schools." (AR 2356.) More importantly, Cintron testified that she regularly performs such tests, and when Plaintiffs' counsel asked whether she sought suggestions on how to complete the test, she testified that she did. She specifically testified that she asked his teachers, who responded that B.G.'s unwillingness was consistent with his behavior in class. (AR 2357.)

5

(AR 691), and needs assistance waking up on time and reminders to brush his teeth. (AR 689.) Cintron also testified about B.G.'s family history, particularly the period during which his father died and DCFS placed B.G. in the care of his aunt. (AR 17 ¶ 27.)

The IHO discussed and considered the errors made by the psychologists in administering the tests, but nevertheless, she found their testimony credible and persuasive. (AR 21 at ¶ 50.) For example, she acknowledged that Coehlo erred when she failed to note that she used some Spanish while administering the WISC-IV test. (AR 13 ¶ 11; ¶ 17.) But Cintron also testified that B.G. did not struggle speaking or understanding English, and consistent with the testimony of other District witnesses, she stated that B.G. was more comfortable in English. (AR 13-19; 2441-2442; 2312; 2372-74.) Cintron also conceded that she should not have classified B.G.'s IQ score of 71 as "borderline," in her report, because it was in fact a failing score. The IHO found that in spite of the "borderline" classification, the score was low enough that the IEP team was on notice and considered whether B.G. might have an intellectual disability. (AR 14-15, ¶ 16; AR 17 ¶ 36.) Finally, Cintron failed to include an "f score" pertaining to false positive responses in the BASC-2 test. None of these errors, the IHO found, invalidated the assessments because none were reviewed in isolation. Instead, the test results were compared for consistency, and brought to the IEP team for further comparison and input. (AR 18 ¶ 31.)

Cintron determined that B.G. was eligible for services under the emotional disability and special learning disability categories. (AR 38 ¶ 40.) Cintron did not believe that B.G. had an intellectual disability.

*Speech and Language Assessment*

The speech and language pathologist, Joellyn Martin, has been employed by the District for twelve years, and prior to that she worked in a skilled nursing facility as a speech language

pathologist. (AR 23 at ¶ 59.) She earned her graduate degree in Speech and Language Pathology, is licensed in the State of Illinois with a certification in clinical competence, has an early intervention credential, and is a member of the American Speech and Hearing Association (ASHA). (AR 23 ¶ 59; 2612-14.)

Martin evaluated B.G. for speech and language services in September 2014. (AR 24 at ¶ 60.) She observed B.G. communicate in both small and large educational settings. (AR 25 at ¶ 66.) When she interviewed B.G. one-on-one, B.G. told her he preferred to speak in English, and he was able to maintain an appropriate conversation and was attentive and cooperative. (AR 25 at ¶ 67.) B.G.'s teacher reported to Martin that B.G. did not talk much in class, but his articulation was clear and the teacher could understand him without difficulty. (AR 24 at ¶ 62.)

Martin administered several assessments, including an Oral Motor Assessment and an informal Voice Assessment, and both rendered results that B.G. was functional for educational purposes. (AR 26 at ¶ 68, ¶ 69.) Through an Articulation Assessment, Martin learned that B.G. occasionally substituted "f" in place of "th." (AR 26 at ¶ 70.) Martin also performed two formal evaluations, the Peabody Picture Vocabulary Test (PPVT-III) and the Comprehensive Assessment of Spoken Language (CASL). B.G.'s test results for the PPTV revealed B.G. had moderate deficits in receptive vocabulary. (AR 26 at ¶ 71.) The CASL revealed the same; his scores were either just below average or in the average range. (AR 26 at ¶ 72.) On cross examination, when Plaintiffs' counsel questioned why Martin did not perform the Mean Length of Utterance test (MLU), Martin explained that she had considered the MLU, but decided against it because the test is not typically used for children B.G.'s age. (AR 29 at ¶ 83.) She testified that research supports that position. (*Id*.) Martin also reviewed an outside assessment, the Lindamood-Bell, procured by J.A.G. (AR 28 at ¶ 79.) Martin articulated her concerns that this

tool was incomplete because, although it provided scores and recommendations, it failed to provide any descriptions of the evaluator's findings. (*Id*.)

Martin determined that B.G. was impaired in receptive language, and the consistent results of the PPVT-III and the CASL tests supported her position. (AR 29 at ¶ 85.) Martin admitted that she lost her speech testing protocols after the IEP meeting, and was unable to produce them at the hearing. (AR 28 at ¶ 81.) The IHO found that this did not invalidate the scores and report, because her report was comprehensive and assessed B.G.'s needs and formulated speech and language goals. (AR 28-29 at ¶ 81.) Finally, Martin testified on cross examination that reading skills was an area beyond her expertise, and that she deferred to the District's reading specialist. (AR 30 at ¶ 87.) Her reluctance to give opinion on subject areas outside of her area of expertise contributed to the IHO's finding that she was a credible and persuasive witness. (*Id*.)

*Physical Therapy Evaluation*

Andrea Alter has been a District employee for three years. (AR 31 at ¶ 94.) She holds a Doctorate in Physical Therapy from Boston University, and is a licensed physical therapist in Illinois and a member of the American Physical Therapy Association. (*Id*.)

Alter conducted her physical therapy evaluation of B.G. on October 24, 2014. (AR 31 at ¶ 95.) Based on her observations during class, recess, lunch, and transitions in between those subjects, Alter observed that B.G. was able to sit upright in class, both on a chair and on the floor, and that he was able to walk and navigate halls, stairs, and other obstacles. (AR 32 at ¶ 98.) He also demonstrated strong performance with gross motor skills. (AR 33 at ¶ 103.) B.G.'s physical education teacher reported to Alter that B.G. participated in gym class, spoke up for himself when he needed breaks, and received necessary curriculum modifications. (AR 32 at

¶¶ 99, 106.)  Additionally, B.G. met after school on a weekly basis with the school social worker for twenty minute sessions of interval circuit training.  (AR 32 at ¶ 100.)

During the formal assessments, B.G. demonstrated decreased endurance, likely due to his obesity and other medical conditions.  (AR 33 at ¶ 101.)  At times, B.G. was unwilling to participate in the formal physical assessments, and so the results of some of those tests, Alter noted, were not accurate because she had seen B.G. move much more outside the assessment times.  (AR 33 at ¶ 101.)  Ultimately, Alter found that his endurance was not an issue for the short transitions required during the school day.   (AR 33 at ¶ 101.)

Alter concluded that B.G. independently accessed the education environment, and therefore did not need physical therapy services.  (AR 33 at ¶ 103.)  Instead, she recommended modifications and accommodations in physical education areas due to his decreased endurance. (AR 33-34 at ¶ 103.)

*Occupational Therapy*

The occupational therapist, Rebecca Cassidy, is an outside contractor with the District, and she is employed by Health Pro Rehabilitation, a private rehabilitation facility.  She has worked with the District for twenty-seven years.  (AR 35 at ¶ 109.)  She supervises occupational therapists in the District and provides professional development training.  (*Id*.)  She has a Bachelor of Science in occupational therapy, and she is licensed in Illinois and certified in the USC Sensory Integration and Praxis Test.  (AR 35 at ¶ 110.)

Cassidy evaluated B.G. on September 19, 2014.  (AR 36 at ¶ 113.)  B.G.'s teacher reported to Cassidy concerns about B.G. completing work and following routines.  (AR 36 at ¶ 115.)  After observing B.G. in the classroom, Cassidy followed B.G. through daily transitions, observing his sensory processing, movement, interaction with other students, and strategies to

get from place to place. (AR 36 at ¶ 116.) She observed that B.G. was able to access the school environment without difficulty, and that he could perform self-help activities such as managing the bathroom independently. (AR 36 at ¶ 117; ¶ 118.)

Cassidy administered formal assessments, including the McMasters Writing Assessment, and B.G. was able to copy work legibly, completing 50 letters per minute, within the appropriate range for a sixth grade student. (AR 37 at ¶ 120.) However, due to B.G.'s unwillingness to pay attention, the results of the Visual Closure subtest of the Development Test of Visual Perception (DVPT-A) were not reliable. (AR 37-38 at ¶ 121.) Overall, Cassidy noted that B.G. had the physical skills to write, but putting thoughts on paper was difficult for him. (AR 37-38 at ¶ 120.) Cassidy also evaluated his computer skills, and B.G. was able to navigate an unfamiliar computer, although his typing speed was below average for students his age. (AR 38 at ¶ 122.) She made recommendations to assist and increase B.G.'s speed in performing work, including the use of Co-Writer or word prediction software in the classroom and increased keyboarding practice 3–5 times a week. (AR 38 at ¶ 123.)

On cross examination, when Cassidy was asked why she did not administer the Sensory Profile School Companion, she explained that the test was inappropriate for a student as old as B.G., and that her position was supported by research. (AR 39 at ¶ 124.) Plaintiff's expert, Dr. Goldstein, opined that there should have been follow up in the area of the Visual Closure subtest of the VPT-A. (AR 40 at ¶ 130.) However, because Dr. Goldstein did not possess any licenses, certification, or work experience in the field of occupational therapy, the IHO did not qualify him as an expert in the subject, and therefore found this testimony unpersuasive. (AR 40 at ¶¶ 133-135.) Cassidy determined that B.G. was not eligible for occupational therapy services.

*Nursing Evaluation*

Frederickson has been employed as a school nurse in the District for twenty-one years. Prior to that position, she was a nurse assigned to the neuroscience unit at Children's Memorial hospital. (AR 41 at ¶ 137.)

Frederickson evaluated B.G. on September 25, 2014. (AR 41 at ¶ 139.) She reviewed his entire record and specifically B.G.'s poor attendance record. (AR 41 at ¶ 139.) She noted B.G. had hearing issues due to wax impaction, but that he passed the hearing screening in 2013, so she had not followed-up. (AR 43 at ¶ 150.) She noted at the time of her report that B.G. had been losing weight and his daily oxygen was discontinued. (AR 41 at ¶ 140.)

Frederickson requested B.G.'s list of medications from J.A.G. twice but never received the list. Frederickson also discussed some of her concerns about B.G.'s health with the physical education teacher and social worker, and they shared with her documentation from B.G.'s physician which allowed him to participate in school physical activities without restriction. (AR 41 at ¶ 146.) In 2009, Frederickson noted that B.G. should be monitored for increased distractedness and inattention, but by 2014, ADHD was not an area of suspected disability. (AR 44 at ¶ 154.)

Frederickson testified that B.G. has been obese all of his life. (AR 44.) She set goals for B.G. relating to reading food labels, and B.G. showed a willingness to try, but gave up after a week. (AR 44-45 at ¶ 156.) She also discussed B.G.'s lunches, and B.G. indicated he was eating school lunches—which Frederickson determined was healthier than those brought from home. (AR 45 at ¶ 156.)

*Social Work Evaluation*

The Social Worker, Jennifer Avilas, has been a social worker in the district for the last eighteen years. Avilas has a Bachelor's Degree and a Master's Degree in Social Work and an Illinois type 73 license. (AR 46 at ¶ 161.) She is fluent in Spanish. (AR 46 at ¶ 162.)

Avilas provided the Strengths and Difficulties Questionnaire (SDQ) to both B.G.'s current and former special education teachers. The current teacher's questionnaire yielded a close to average rating, but his former teacher yielded a very high score indicating areas of concern in lack of considering other's feelings, sharing with others, disruptive behavior, failure to follow adult requests, and poor work completion. (AR 47 at ¶ 166.) Avilas observed B.G. in his special education classroom on September 19, 2014, and B.G. was disruptive and would not take direction from his paraprofessional aide. (AR 48 at ¶ 172.)

When interviewing B.G. during the assessment, she spoke with B.G. in English and did not encounter any language barriers. (AR 48 at ¶ 171.) Avilas interviewed J.A.G., in Spanish, on September 24, 2014, for approximately one hour. (AR 47-48 at ¶ 168.) J.A.G. shared concerns about B.G.'s poor academic success. (*Id.*) J.A.G. also shared that she thought B.G. was unable to verbalize his frustrations; for example, he would kick J.A.G.'s car after not getting what he wanted in a store, and she struggles getting him to take a bath. (*Id.*) Avilas also testified about B.G.'s family and living situation, including that the family lived in a small apartment, and that they received social welfare benefits. (AR 47-48 at ¶ 168.)

Avilas recommended social-emotional accommodations be implemented throughout the day and gave specific instructions. (AR 49 at ¶ 174.) She also recommended social work minutes be increased and indirect consultative services for B.G. (AR 49 at ¶ 174.) If J.A.G. chose to pursue outside counseling, specifically relating to B.G.'s grief from the loss of his

father, Avilas offered to provide recommendations for professionals in the community. (AR 49 at ¶ 174.) Avilas agreed with the determination that B.G. had an emotional disorder based on his poor motivation, behavioral concerns, and the trauma from the loss of his father. (AR 50 at ¶ 180.) At the IEP meeting, J.A.G. specifically indicated that she agreed with the report and did not note any concerns. (AR 49-50 at ¶ 177.)

*Assistive Technology Evaluation*

For eight years, Christa Lohman has worked as an Assistive Technology (AT) teacher on a consultative basis for the District to assist in determining the appropriate technology to meet individual student needs. (AR 51 at ¶ 182.) Prior to that, Lohman was a CPS teacher for four years. (AR 51 at ¶ 182.) Lohman has a Bachelor of Arts in special education with an emphasis on behavioral disorders and mild to moderate cognitive disabilities, a Master's Degree, an Assistive Technology certification from the Rehabilitation Engineering Society of North America, and an Illinois certification in special education. (AR 51 at ¶ 183.)

The District identified B.G.'s needs in the areas of reading comprehension, language usage, written expression, and access to curriculum via complex text and reading expression. To aid B.G. in those areas, the District referred him to Lohman for an Assistive Technology evaluation. (AR 51 at ¶ 184.) For her September 24, 2014 evaluation, Lohman interviewed J.A.G., B.G., B.G.'s special education teacher, and made classroom observations. (AR 51-52 at ¶ 185; AR 53 at ¶ 192.) In determining the appropriate technology, Lohman took into consideration B.G.'s classroom teacher's determination that his reading level was pre-K. (AR 54 at ¶ 196.)

Lohman used the protocol comprised by the Georgia Project for assistive technology, because there are no standardized protocols in Illinois. (AR 52 at ¶ 187.) The philosophy is to

try support, see how it works for a student, and then eliminate or modify accordingly. Lohman tried various technologies to assist B.G. She found that B.G. was motivated to use a speaking dictionary, which helped with his reading, so she made a recommendation for integrating appropriate use of the dictionary. (AR 52 at ¶ 186.) Lohman also tried word prediction software programs, specifically Cowriter and Write Outloud, which both worked for B.G. and so she added the programs to her recommendation. (AR 52 at ¶ 190.) She tried a portable word processor with auditory feedback to see if it would assist B.G. in writing sentences more independently, but that technology did not seem to increase B.G.'s ability. (AR 52 at ¶ 189.) Similarly, text to speech software did not appear to increase B.G.'s ability to comprehend in reading. (AR 52 at ¶ 191.) Lohman also testified on cross examination why she did not use certain technologies, such as "book share." (AR 57 at ¶ 206.) Technology recommendations, she explained, should support a student in development of specific skills rather than take over those skills. (AR 55 at ¶ 199.)

Lohman recommended the use of desk top and lap top computers, a speaking dictionary, Cowriter, and WriteOutloud. (AR 54 at ¶ 193.) Lohman showed these technologies to J.A.G.; J.A.G. did not express any concerns, and seemed to be in agreement with the recommendations. (AR 54 at ¶ 194.) In her opinion, with the consistent use of technology, and consistent attendance, B.G. would be able to write several sentences independently within a year. (AR 56 at ¶ 201.)

*Plaintiffs' Expert Witnesses*

Plaintiffs presented the expert testimony of Dr. Goldstein to rebut the District's psychologists. (AR 22 ¶ 51.) Plaintiffs requested that Dr. Goldstein be considered an expert in each of the seven areas that Plaintiffs had requested an IEE in. (AR 22 at ¶ 53.) However, based on Dr. Goldstein's education, experience, and credentials, the IHO found Dr. Goldstein was only an expert in the field of psychology. (AR 22 at ¶ 53.)

Dr. Goldstein had never met B.G. or J.A.G. (AR 22 at ¶ 52.) He did not conduct any interviews with school staff or make any classroom observations. (AR 22 ¶ 52.) He testified that the psychological evaluation was insufficient because it failed to consider ADHD symptoms and indications of intellectual disability. (AR 22 at ¶ 54.) Dr. Goldstein further criticized the administration of the WISC-IV because of possible language translations, and for failure to obtain cooperation during testing. (AR 22 at ¶¶ 55, 56.) Based on the evidence, the IHO found Dr. Goldstein's testimony credible but unpersuasive. (AR 23 at ¶ 58.)

Plaintiffs also sought to qualify Dr. Caroline Bailey as an expert in the area of speech language pathology. Dr. Bailey is a psychologist/social worker, but she is not a certified speech language pathologist in Illinois and is not licensed or certified to deliver speech services. (AR 30 at ¶ 90.) She is familiar with the CASL in the context of a neuropsychological evaluation, but has never personally administered the assessment. (AR 30 at ¶ 90.) Based only on a review of the record, Dr. Bailey testified that the additional CASL subtests should have been performed to identify B.G.'s language needs. (AR 28-29 at ¶ 91.) The IHO found the testimony credible, but unpersuasive because Dr. Bailey did not evaluate B.G., conduct classroom observations, or interview school staff. (AR 31 at ¶ 92.)

## II.    Standard of Review

Under the IDEA, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." § 1415(i)(2)(C).

The applicable standard of review is not "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. v. Ross*, 486 F.3d 267, 270 (7th Cir.2007) (quoting *Bd. Of Educ. Of the Hendrick Hudson Cent. Sch. Dist* v. *Rowley*, 458 U.S. 176, 206 (1982)).   Indeed, "courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Heather S. v. State of Wis.*, 125 F.3d 1045, 1054 (7th Cir.1997) (quoting *Rowley*, 458 U.S. at 208); *see also Grim v. Rhinebeck Central School Dist.*, 346 F.3d 377, 382 (2nd Cir.2003) ("the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers.")  Thus, courts must give "due weight" to the determinations made during the administrative process.  *Id.* The party challenging the decision has the burden to show that the preponderance of the evidence did not support the hearing officer's decision.  *Evanston Cmty. Consol. Sch. Dist. No. 65 v. Michael M.,* 356 F.3d 798, 802 (7th Cir. 2004).  And, like the IHO, the court is required to "give deference to the opinions of professional educators as regards educational issues." *See Brad K, 787 F.Supp.2d at 738.*

Pursuant to IDEA, a student with disabilities is entitled to a FAPE designed by the child's school district to meet his or her particular needs. 20 U.S.C. §1400(d)(1)(A) (2010).  To protect the informed involvement of the parents in developing the education process for their child,

IDEA requires the states to provide numerous procedural safeguards, including "an opportunity for the parents of a child with a disability . . . to obtain an independent educational evaluation ["IEE"] of the child." 20 U.S.C. § 1415(a), (b)(1) (2005). The parents of a student with disabilities has the right to obtain an IEE of their child at public expense if: (1) the parent disagrees with an evaluation obtained by the school district; (2) the district files a due process complaint and an independent hearing officer finds the district's evaluation inappropriate; and (3) the independent hearing officer finds the parent's IEE meets the necessary criteria for that type of evaluation §1415(b)(1), (6), (d)(2)(A).

## III. Motion to Supplement

Accompanying their motion to reverse the arbitration decision, Plaintiffs filed a motion to supplement the record with five exhibits, and assert that "[w]hile none is critical to student's case, they will assist the court in weighing the parties' claims." (Dkt. No. 48 at 1.) The Seventh Circuit has delineated a sliding scale approach to this issue: the more new evidence on appeal, the standard of review becomes less deferential to the IHO; the less evidence taken on, the more deference to the IHO. *Alex R. v. Forrestville Valley Cmty. Unit Sch. Dist.*, 375 F.3d 603, 612 (7th Cir. 2004). Even so, if a court takes on mounds of new evidence, it should proceed vigilantly to avoid legal error; the district court must consult the administrative record and cannot conduct a trial *de novo*. *Id; see also Monticello Sch. Dist. No. 25 v. George L.*, 102 F.3d 895, 901 (7th Cir. 1996) (A district court must be "careful not to allow such evidence to change the character of the hearing from one of review to a trial *de novo*.") (quoting *Town of Burlington v. Dep't of Edu.*, 736 F.2d 773, 791 (1st Cir. 1984), *aff'd sub nom. Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.,* 471 U.S. 359 (1985).).

The first proposed exhibit is a case law submission inadvertently omitted from the hearing record (Dkt. 48 at 2); the second exhibit is B.G.'s counsel's complete closing argument at the hearing (Dkt. 48 at 2); the third exhibit is a testing manual "improperly excluded" from the hearing (Dkt. 48 at 3); and the fourth and fifth exhibits include the IEEs by Mara Lane and Ari Goldstein for which Plaintiffs seek reimbursement (Dkt. 48 at 4). The Court grants Plaintiffs' motion with respect to the case law submissions and closing argument. The Court denies Plaintiffs' motion with respect to the remaining three exhibits.

The Court denies the motion with respect to the third exhibit, the blank testing protocols. During the hearing, the IHO asked Plaintiffs' counsel the purpose of introducing the blank CASL protocol. (AR 2723-2724.) Counsel for the District argued that it was not the actual protocol used in assessing B.G., which were misplaced after the IEP meeting. (*Id.*) The IHO sustained the objection, but permitted Plaintiffs' counsel to question the District's speech and language evaluator, Martin, about whether she filled out the protocol completely. (*Id.*) The IHO also gave Plaintiffs the opportunity to argue the significance of CASL and question witnesses regarding administration of such testing, and the IHO had the benefit of that testimony in reaching its final determination. Had this been the only test administered by the speech pathologist, the blank protocols might carry more weight in the Court's review of the record— but it was only one of the assessments she administered. The Court sees no reason to disturb the IHO's ruling, and Plaintiffs do not provide any citation demonstrating that there was a legal error in its decision.

Next, Plaintiffs move to supplement the record with IEEs performed after the administrative hearing. Plaintiffs contend that comparing the independent assessments eventually obtained could help clarify what was wrong with the District's assessments. (Dkt. 48 at 4.) While the Court may take on new evidence, granting Plaintiffs' request would result in a

trial *de novo*. The appropriateness of an IEP "can only be judged by examining what was objectively reasonable at the time [the team created the IEP.]" *M.B. ex rel. Berns v. Hamilton Southeastern Schools*, 668 F.3d 851, 863 (7th Cir. 2011) (internal citations omitted.). Plaintiffs do not provide binding case law, or any case law at all, that demonstrates supplementing the record with IEE's obtained after the administrative hearing would be appropriate. In *Warren G. v. Cumberland Co. Sch. Dist.*, cited by Plaintiff[5], the Third Circuit reviewed a case in which the IEEs had been done prior to the administrative hearing. 190 F.3d 80, 87-88 (3d Cir. 1999). Supplementing the record with post-hearing evaluations was not an issue before the trial court. *Id*. At the administrative hearing, the IHO, like the hearing officer in *Warren*, compared the available outside reports, produced by Dr. Goldstein and Dr. Bailey, to those done by the District.

The IHO found that the District's evaluations were appropriate.[6] The directive within the regulation is: "If the public agency files a due process complaint notice to request a hearing and the final decision is that the agency's evaluation is appropriate, *the parent still has the right to an independent educational evaluation, but not at public expense*." 34 C.F.R. § 300.502(b)(3) (2006) (emphasis added.) Plaintiffs had the right to introduce any IEEs which had already been performed at the hearing. *Id*.§ 300.502 (c). Nothing in the statute indicates that parents should expect reimbursement for private IEEs performed *after* a due process hearing in which the IHO determines the school district's evaluations were appropriate; nothing in the statute gives the district court authority to review such subsequent IEEs when reviewing an IHO's decision; and Plaintiffs do not cite to any case law or regulations which support their position.

---

[5] This is the only case law cited to in Plaintiffs' brief in support of their Motion to Supplement.
[6] Defendants also state that in order to reimburse under IDEA for the two evaluations, a new due process hearing must be initiated. §1415(b)(1), (d)(2)(A)— but the Court does not see that direction in the cited passages. (Dkt. 53 at 15.)

## IV.    The Administrative Hearing

Before addressing Plaintiffs' arguments regarding the IHO's procedural and legal errors at the Administrative Hearing, the Court makes two threshold observations.  First, Plaintiffs must demonstrate that the IHO made some legal error for this Court to reverse the decision.  *See Brad K.*, 787 F.Supp.2d at 738.  Plaintiffs' motion is scarce on citations to case law, the regulations, and sometimes even lacks citations to the record.[7]  Second, J.A.G. was present, with counsel, at the IEP meeting.  J.A.G. did not object to, or express disagreement with any of the reports presented at the meeting.  She also did not object when the District's professionals spoke to her prior to the IEP meeting regarding their assessments.  While a parent's failure to object to an IEP does not waive their right to challenge, it "casts significant doubt on their contention that the IEP was legally inappropriate[.]"  *T.G. ex rel. T.G. v. Midland Sch. Dist. 7*, 848 F. Supp. 2d 902, 916 (C.D. Ill. 2012), *aff'd sub nom. Giosta v. Midland Sch. Dist. 7*, 542 F. App'x 523 (7th Cir. 2013), as amended (Nov. 5, 2013) (quoting *Carlisle Area School v. Scott P. By and Through Bess P.,* 62 F.3d 520, 536 n. 8 (3rd Cir.1995)).

Turning to the Motion, the Court will first address alleged procedural errors by the IHO.  Next, Plaintiffs' more broad arguments can be summarized as follows: 1) the IHO excused the district from addressing B.G.'s language needs (Dkt. 43 at 20); 2) the IHO improperly shifted the burden of proof to Plaintiffs at the hearing (Dkt. 43 at 4); 3) the IHO presumed assessor's expertise without evidence (Dkt. 43 at 5); 4) the IHO excused the district from appropriately assessing B.G.'s disabilities, (Dkt. 43 at 4).  Finally, the IHO, according to Plaintiffs, erred in

---

[7] In the entirety of their brief, Plaintiffs do not cite to a single Seventh Circuit decision and, in fact, only have one citation to a district court even within the Circuit.  Plaintiffs failed to cite any case law and do not flesh out their legal position in any depth—which results in waiver. *See United States v. Hassebrock*, 663 F.3d 906, 914 (7th Cir. 2011) (finding the argument was "decidedly underdeveloped and therefore waived"); *United States v. Foster*, 652 F.3d 776, 793 (7th Cir. 2011) ("As we have said numerous times, undeveloped arguments are deemed waived [.]") (internal quotation marks and citation omitted). Defendants' brief does not fare much better.

finding each of the individual assessments appropriate. None of these arguments convince the Court, by a preponderance of the evidence, that the IHO erred such that reversal is warranted.

A. The IHO's Procedural Rulings

Procedural violations committed by the hearing officer at a due process hearing only violate the IDEA if they "result in the loss of educational opportunity." *Heather S.*, 125 F.3d at 1059; *see also James D. v. Bd. of Educ. of Aptakisic-Tripp Cmty. Consol. Sch. Dist. No. 102*, 642 F. Supp.2d 804, 819 n.11 (N.D. Ill 2009). IHOs have the inherent authority "to manage hearings to avoid needless waste and delay." *L.S. v. Bd. of Educ. of Lansing School Dist. 158*, No. 14-cv-10052, 2015 WL 3647759, *5 (N.D. Ill. June 11, 2015). Plaintiffs argue that the IHO did not give Plaintiffs sufficient time to present evidence, the IHO improperly excluded and rejected testimony, and the IHO improperly narrowed issues to pre-hearing concerns. (Dkt. 43 at 7.)

In reviewing the record, the IHO made sufficient efforts to accommodate the parties and their witnesses. The Prehearing Conference was held over the course of three days and a total of nine hours in order to identify issues to be addressed, witness testimony, and the parties' documentary evidence. (AR 4.) The hearing was set for three days, and the IHO set time limits on the witness testimony, but Plaintiffs' counsel repeatedly ran over the allotted time, and at the end of the fifth day, the IHO denied Plaintiffs' request for a sixth day, and the hearing concluded on March 9, 2015 at 5:30 p.m. (AR 6; 625.) Closing arguments were submitted in writing after the hearing concluded. (AR 4-5; 412.) The IHO's conduct was proper.

Plaintiffs next argue that the IHO should have found Dr. Goldstein was an expert in more areas than psychology, but give no legal citation beyond Federal Rule of Evidence 702, and do not develop the Rule 702 analysis. (Dkt. 43 at 7.) Plaintiffs also assert that the IHO "rejected broader testimony," from their experts without pointing to any specific portions of the record in

which this was done. (*Id.*)  The IHO's determinations regarding Plaintiffs' experts were all well-reasoned in her Final Determination.  First, Dr. Goldstein admitted that he is not certified or licensed in social work, speech/language pathology, occupational therapy, physical therapy, assistive technology, or nursing, and accordingly the IHO found him to be an expert solely in the field of psychology.  The Court sees no legal error in this determination.  Next, Dr. Goldstein never met B.G., did not evaluate him, and did not interview any of B.G.'s teachers or other school staff (AR 3085; 3459.)  Dr. Bailey similarly did not evaluate B.G., did not conduct classroom observations, and did not conduct any interviews with school staff.  (AR 2259, 2567.)[8] The IHO took this into consideration in determining how much weight to give the expert testimony, and Plaintiffs do not cite to any legal support that this was inappropriate.

Finally, Plaintiffs assert that the IHO improperly narrowed pre-hearing concerns.  (Dkt. 43 at 7.)  During the pre-hearing, the IHO stated to Plaintiffs that the IHO wanted to "define the issues as Parent's counsel believes them to be with a reasonable degree of specificity – tying your contention that specific evaluations are 'inappropriate' to the specific sections of IDEA pursuant to which you believe them to be 'inappropriate.'"  (AR 420.)  At that time, Plaintiffs' counsel made the same argument she does here, that this was an "inappropriate narrowing" of the issues leading up to the hearing.  (AR 467.)  There is no supporting case law demonstrating that the request was inappropriate.

---

[8] Plaintiffs acknowledge that the experts "underwent extensive voir dire."  (Dkt. 43 at 10.)  In pre-hearing communications, the IHO explained that, "the District is objecting to the Parent's experts, I will allow the opposing party to "voir dire" the witness with respect to his or her qualifications.  I will then make a determination as to whether the witness is 'qualified' as an expert[.]" (AR 436.)  The record also demonstrates that Defendant's counsel worked to accommodate Plaintiffs' experts' schedule, this included working around Dr. Bailey's schedule for taking pain killers for a knee injury.  (AR 497.)

Moreover, Plaintiffs fail to describe how any of these three procedural violations resulted in the loss of an educational opportunity to B.G. *See Heather S.*, 125 F.3d at 1059; *see also James D.*, 642 F. Supp. 2d at 819 n.11.

B. B.G.'s Language Needs

The IHO's legal conclusions appropriately addressed B.G.'s language needs. In evaluating a child, the educational agency must ensure that assessments are "in the language and form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally[.]" 20 U.S.C.1414(b)(3)(ii) (2016). The IEP team must, in the case of a child "with limited English proficiency, consider the language needs of the child as such needs relate to the child's IEP." *Id.* § 1414(d) (3)(B)(ii).

Plaintiffs emphasize the District's failure to assess B.G.'s Spanish language needs, and that the IHO overlooked the issue. (Dkt. 43 at 10-11, 20-21 ) The IHO actually found that by giving the tests in English, the District was in accordance with 34 C.F.R. § 300.304(c)(1)(ii), because this was the form "most likely to yield accurate information." The IHO's finding that B.G. was proficient in English is supported by the multiple professionals who assessed B.G. and testified about their communications with the student at the due process hearing. (AR 13-19; 2312; 2372-74.)[9] Of the two psychologists who assessed B.G., one holds a bilingual Spanish certification, and the other holds a certificate in Spanish special education. Plaintiffs do not meet their burden of demonstrating, by a preponderance of the evidence, that the IHO committed a legal error with respect to B.G.'s English proficiency.

---

[9]The District's psychologist, Cintron, stated that English was B.G.'s primary language for processing, and elaborated that "when you ask [B.G.] like even in the IQ test when you ask him questions, that's the language he responds back in or it's the only language he is responding in." (AR 2382.) She further testified that B.G. was not an English learner. (AR 2381-2382.)

C.  Burden of Proof

The IHO acknowledged that the District had the burden of proving the appropriateness of the evaluations.  (AR 59.) (citing *Board of Education of Murphysboro Community Unit School District No. 186 v. Illinois State Board of Education*, 41 F.3d 1162, 1167, 1169 (7th Cir. 1994).).  Nevertheless, Plaintiffs assert that the IHO improperly shifted the burden to Plaintiffs, because, in the IHO's findings, she noted that Dr. Goldstein could not "definitively state" that errors made by the District's psychologists rendered the assessments invalid.  (Dkt. 43 at 4.)  Plaintiffs suggest that this forced Plaintiffs to prove that the District's errors rendered the assessments invalid.  The IHO's findings did not hinge on Dr. Goldstein's testimony.  The IHO's conclusion was based on the variety of tools and assessments the psychologists used with B.G., and that she found them to be persuasive and credible witnesses.

The IHO also confronted the errors made by the psychologists in her findings.  Dr. Goldstein testified that WISC-IV requires interpretive caution for students not proficient in English. (Dkt. 43 at p. 11.)  Coehlo admitted she did not know the WISC-IV required interpretive caution.  However, Dr. Goldstein further testified that if B.G. was fully proficient in English, then the WISC-IV could be administered correctly *without* cautions.  (AR 3318.)  Therefore, Plaintiffs' position that Coehlo erred in not proceeding with interpretive caution presumes B.G. lacks English proficiency, and the evidence on the record contradicts that presumption.  Coehlo also used some Spanish in administering the WISC-IV and did not note it.  (AR 15 at ¶ 17.)  Both parties agree that this was inappropriate.  But because no test was viewed or analyzed in isolation, and the results of the WISC-IV were confirmed by other tests administered to B.G. in English only, the IHO did not find that these errors invalidated the psychological assessment.  (AR 18 at ¶ 31.).

D.  Assessor Qualifications

Plaintiffs assert that the IHO "disregarded extensive information that B.G.'s assessors were not sufficiently trained and knowledgeable," and instead only "[i]nfer[ed] sufficiency of knowledge from hiring and promotion decisions[.]" (Dkt. 43 at 6.) The qualifications of the District's assessors went well beyond simple hiring and promotion decisions.  The assessors each had multiple degrees, licenses, and years of experience in their respective fields.  (AR 12, 15-16, 23, 31, 35, 41, 46.)

E.  Assessing for Suspected Disabilities

In general, the goal of a school's evaluation is to "determine whether a child is a child with a disability" and to "determine the educational needs of such child."  § 1414(a)(1)(C)(i)(I). The regulations broadly define "specific learning disability" as "a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations." 34 C.F.R. § 300.8(c)(10)(i) (2007).  Plaintiffs assert that the IHO failed in excusing the District's failure to assess for certain disabilities, and inappropriately applied other labels.

*Labels v. Needs*

Plaintiffs assert that, in assessing for disabilities, the IHO incorrectly believed that what mattered most was B.G.'s needs, even if determining the exact labels proved difficult.  Based on this belief, the IHO made a "false 'labels' versus 'needs' dichotomy."  (Dkt. 43 at 5.)  However, Plaintiffs fail to develop their argument that the IHO discounted the importance of "labels." Plaintiffs cite to *Warren G. v. Cumberland Co. Sch. Dist.*, but the facts are entirely

distinguishable in the Third Circuit's decision.[10]  190 F.3d 80 (3d Cir. 1999).  In *Warren*, the district court had affirmed a special education panel's decision finding that even though the school's evaluations clearly violated IDEA, the panel denied reimbursement on the basis of the parents' inappropriate conduct during the proceedings.  Here, the IHO did not find clear violations of IDEA but withhold reimbursement on some other basis.  The administrative decisions cited to also do not help Plaintiffs.  For example, in *CPS*, Case 4041, 44 IDELR 294 (ISBE 2005), the school district blatantly ignored the student's needs: the social worker testified and suggested the student might be psychotic, and then there was no follow-up or referral made to a psychiatrist or school psychologist.  *Id*. at 3.  No similar facts exist in this record.  Cintron testified that B.G.'s irregular attendance made determining the precise label difficult in the assessment that took place that year, but that ultimately the IEP team addressed his needs.  (AR 63.)  The Court sees no legal error in the IHO crediting that testimony in finding the assessments were appropriate.

*ADHD*

Plaintiffs also assert that the District failed to assess for ADHD.  Plaintiffs argue that "[i]dentifying ADHD is feasible and necessary and cannot be foisted by districts onto parents or doctors."  *CPS*, 22 IDELR 1008, 3-4 (1995).  But there is no support that identifying ADHD should be "foisted" onto the Districts, either.  In the administrative decision Plaintiffs cite to, the parents already had obtained a diagnosis of ADHD from a psychologist outside of the school district.  Although the school district knew of the diagnosis in that case, the district "put

---

[10] Plaintiffs additionally cite to a decision that was vacated and remanded by the Seventh Circuit.  *Board of Educ. of Oak Park v. ISBE & Kelly E*., 21 F.Supp.2d 862 (N.D. Ill. 1998), overruled on other grounds by *Board of educ. v. Kelly E.*, 207 F.3d 931 (7th Cir. 2000).  However, the Seventh Circuit did not overturn based on the proposition cited for. This still does not help Plaintiffs because the student in *Kelly E.* had already been diagnosed with ADHD, and therefore the District was required to address both her ADHD and LD, and had not done so.  There is no similar allegation here that the District failed to address a known diagnosis.

themselves in a position at the outset of not being able to substantially verify [the student's] diagnostic profile." *Id.* at 3. Here, there was no outside diagnosis that the District failed to consider.

The District did not ignore evidence of B.G.'s possible symptoms of ADHD. (AR 63, 70.) The IHO concluded that ADHD is a medical diagnosis. The IHO further found that B.G.'s 2009 Psychological Evaluation Report indicating symptoms of ADHD was unreliable because it was outdated. Moreover, the report gave J.A.G. five years to follow up on possible ADHD, which she never did. (AR 57 at ¶ 210.) The IHO did not commit an error in finding that the District sufficiently considered ADHD.

*Intellectual Disability*

Plaintiffs assert that the District may have missed a diagnosis of an intellectual disability. District-psychologist Coehlo concedes that she "misdefined" B.G.'s score as "borderline" on the WISC-IV test. The borderline score, Plaintiffs suggest, may have indicated intellectual disability. (Dkt. 43 at 8.) But, while Coehlo conceded that she should have used a term other than "borderline," she further explained that a psychological report in isolation does not determine eligibility for learning disabilities, and more specifically, if a test score is unreliable, then the team relies more heavily on teacher input at an IEP meeting, (AR 2435), and B.G.'s teacher did not express concerns of intellectual disability. (AR 2438.)

Further, Plaintiffs' position on B.G.'s possible intellectual disability is, at times, puzzling. For example, Plaintiffs assert that "CPS's report did not even address the possibility that B.G.'s IQ was now in the intellectually disabled range; instead, it left the impression to any knowledgeable reader that he might or might not be[.]" (Dkt. 43 at 12.) While Plaintiffs seem to stress the District's failure to determine the exact labels, Plaintiffs then elicited testimony from

Dr. Goldstein about how dangerous a label of "intellectual disability" might be to a student. Plaintiffs' counsel asks Dr. Goldstein: "Q: And would it be a pretty significant problem for a student's medical records to say that he had intellectual disability if he did not? A: Oh, absolutely." (AR 3118.) Moreover, Dr. Goldstein explained that B.G.'s "previous history didn't indicate any type of intellectual disability." (*Id.*) The district-psychologists considered whether B.G. had an intellectual disability, but based upon assessment data, decided against the label in B.G.'s case. (AR 63.) The IHO did not commit a legal error in finding this testimony credible.

*Emotional Disability*

Plaintiffs also assert that Cintron failed to an analyze B.G.'s IQ drop in determining his exact disability, and that the IHO incorrectly attributed the drop to B.G.'s emotional disability. But, as the IHO pointed out, the district-psychologist Cintron did review and consider the prior WISC-IV scores, and noted regression in several areas. (AR 62.) The District assessors had difficulty in determining whether B.G.'s falling IQ score was due to a learning disability or an emotional disability, because a falling IQ score could be common students with either disability. Cintron testified: "Q: Is it unusual for an I.Q. score to fall form the low average range to the bottom of the borderline range? A: Actually [sic] a profile that I see common in children who have emotional disabilities." (AR 2360.) The IHO did not err when she accepted the District's position. (AR 19 at ¶ 36.)

According to Plaintiffs, the District also failed to distinguish between B.G.'s grief for the loss of his father and emotional disability. (Dkt. 43 at 19.) The IHO cited to Cintron's testimony in which she explained the reasons why B.G.'s behavior was typical of a student with depression. (AR 21 at ¶ 49.) And, even if his grief contributed or formed the basis for B.G.'s depression,

Plaintiffs do not propose how the depression should be treated differently by the District, or why the grief would not qualify B.G. for an emotional disability.

F.  The Assessments and IEP Report

The parameters for adequacy of a student's IEP were set forth in *Bd. of Educ. of the Hendrick Hudson Sch. Dist. v. Rowley*, 458 U.S. 176 (1982).  The United States Supreme Court determined that the student's IEP must be reasonably calculated to provide the student with some educational benefit.  The IDEA does not require districts to provide special education students with the best education available or to provide instruction or services that maximize the student's abilities.  Instead, the Court stated that school districts are required to provide only a "basic floor of opportunity" that "consists of access to specialized instruction and related services which are individually designed to provide some educational benefit to the student." *Id.* at 201.

In *Lolita,* a case Plaintiffs cite to, the school board clearly did not produce a meaningful IEP report. *See Jefferson County Bd. of Educ. v. Lolita S.,* 977 F. Supp. 2d 1091, 1109 (N.D. AL 2013).  The case provides a helpful comparison.  There, the district had not performed any evaluations at all in the area of speech/language, occupational therapy, reading, and transition skills.  And, in the IEP document, on multiple pages, another student's name was typed in, crossed through, and the plaintiff-student's name was written above. *Id.* at 1098-1099.  Finally, when the mother requested reimbursement for IEE's that had not yet been performed, the school board did not file its own request for due process hearing to defend the appropriateness of the child's program, as is required by IDEA. *Id.* at 1103.  It was based on this procedural failure that the court ultimately held reimbursement was appropriate.  Throughout *Lolita*, the adequacy of

the tests were not at issue, but instead the fact that the district had not performed any testing at all and then failed to even follow due process procedures.[11]

In this record, each assessor used a variety of tools and assessments in anticipation of the October 2014 IEP meeting. The IHO went into great detail about why each assessment was appropriate, and the appropriateness of the overall IEP report. While "no IEP is perfect," *Lolita S.,* 977 F. Supp. 2d at 1114, the IHO had a sufficient basis for finding this IEP provided a FAPE.

*Psychological Assessment*

Plaintiffs assert that the psychologists failed to accurately assess and thoroughly analyze the assessments. (Dkt. 43 at 7.) For example, Plaintiffs criticize Cintron because she "did not [] disclose class sizes, ratios, composition, behavior and language modeling, instructional methodologies, curricula, expectations or management style." (Dkt. 43 at 8.) But there was enough for the IHO to determine that the psychologists adequately described the educational environment. Cintron conducted classroom observations, and in her psychological assessment, she went into specific detail regarding the composition of the classroom. (*See* AR 682) ("within the general education setting he was sitting with a group of 4 other students and his paraprofessional.")[12] There is no evidence of legal error in the IHO's determination, based on her extensive factual findings, that the psychologists' assessments were appropriate.

---

[11] The court in *Lolita* does address one factual similarity to this case. There are indications in this record that some of B.G.'s behavior, lack of motivation, and poor attendance contributed to his lack of success, and as *Lolita* notes, these factors cannot be the basis for a claim that the District denied a free and appropriate public education. *See Id.* at 115-116 ("[I]f the district has failed to alleviate [student-plaintiff's] interest in school, that failure is not attributed to its lack of effort and "does not constitute evidence of a denial of free and appropriate public education.")
[12] Plaintiffs' citations also fall short. Plaintiffs cite to a case, *Harris v. District of Columbia,* 561 F.Supp. 2d 63 (D.D.C. 2008), for the proposition that assessments are designed to monitor not just "follow" student progress. In *Harris,* there was a lapse of two years between the school's evaluations of the student. *See id.* at 68. Plaintiffs do not allege an actual gap in the school monitoring him.

*Speech and Language Assessment*

Plaintiffs argue the speech and language assessments were also inappropriate because the speech pathologist, Martin, lost the protocols after the IEP meeting, and the speech and language assessment failed to identify B.G.'s status as a nonreader. (Dkt. 43 at 20.)

Ultimately, the Court agrees with the IHO that the harm in Martin losing the protocols was not significant enough to render her assessment inappropriate. The protocols were lost only after the IEP team had the chance to review them. (AR 2648.) Martin also testified as to why she believed that the assessment was valid despite losing the protocols: "Q: Does the provision of the protocols, or having the actual protocols, does that invalidate your report or its findings in any way? A: No. I still have my scores and I still have information in my report." (AR 2650.) Martin's detailed testimony regarding her assessment, and her comprehensive report, were enough to demonstrate that the assessments were appropriate even though she had lost protocols after the IEP meeting. Moreover, Martin found that, based on her assessment, that B.G. was eligible for speech services; Plaintiffs' argument may carry more weight if the District had not conferred an educational benefit. (AR 2652.)[13]

Next, Martin deferred to a reading specialist when questioned about B.G.'s literacy. The According to the IHO, her willingness to limit her testimony to her area of expertise made her a more, not less, credible witness. While Plaintiffs complain the District failed to identify B.G. as a nonreader, his reading capabilities are directly addressed in the IEP report, including specific goals and benchmarks for the future. Specifically, the IEP report included a "measurable annual goal: using a systematic multi-sensory approach and phonics software, Brando will decode, pronounce, and understand 50 unfamiliar words when reading with 85% accuracy." (AR 761.)

---

[13] In this section, again, Plaintiffs fail to cite to the record – including blank parenthetical, for example (AR  ) (Dkt. 43 at p. 22.)

Plaintiffs do not demonstrate that the speech and language assessment for failure to lose protocols or failure to expound on B.G.'s literacy.

*Physical Therapy*

Plaintiffs' main criticisms of the physical therapy assessment are that the report did not address B.G.'s posture, and it did not address his pain levels. (Dkt. 43 at 24, 26.) But, Alter did address posture: "Q: [I]n your report does it mention posture? A: I did note that he was able to sit in a classroom chair and maintain his balance without assistance. Q: So that's how you evaluate posture, is looking at how he can sit in a chair? A: Yes, balance and posture together." (3028.) Alter further testified that intervention for posture is only appropriate "when students demonstrate low tone and are not able to keep their bodies upright in a chair[.]" (AR 3029.)

Next, Plaintiffs assert that the IHO "mistakenly found that [Alter] had ruled out pain." (Dkt. 43 at 26.) The IHO stated that: "[d]uring her evaluation, she asked student how he was doing (re: pain) and he did not report anything." Plaintiffs are correct that this statement is not supported by the record. However, with the exception of this sentence, the IHO accurately details Alter's testimony. Moreover, the nurse was present at the IEP meeting and able to contribute to any conversations about B.G.'s pain in the decision whether to provide B.G. with physical therapy services. J.A.G. was also present at the meeting and could have contributed to the conversation if there were issues of pain. But there is actually no significant evidence that B.G. was, in fact, experiencing pain such that physical therapy was necessary. The IHO's factual error did not invalidate the legal determination that the physical therapy assessment was appropriate.

*Occupational Therapy*

Plaintiffs assert that the occupational therapist, Cassidy, declared B.G.'s school-related daily living skills based on "self-report and minimal observations." (Dkt. 43 at 26.) Specifically, Cassidy "was unaware of concerns about hygiene." *Id.* Cassidy's testimony does not support these conclusions. Cassidy performed a formal assessment, the McMasters Writing Assessment, and formulated conclusions about B.G.'s ability to write. She also observed B.G. in multiple environments throughout the school day, including the classroom, during transitions in the hallway, and during lunch in the cafeteria. (AR 2888.) She assessed B.G.'s computer skills, and performed assessments of his typing speed. The record supports that Cassidy's observations were not minimal, and went beyond self-reporting.

Cassidy also never testified that she was unaware of hygiene concerns. When Plaintiffs' counsel asks "And did you note that he had – and you noted that he had hygiene issues in that?" (AR 2914), the District objected for lack of foundation, and the objection was sustained. Counsel's questions continued about whether hygiene is something that could affect a student, but counsel never actually returns to the question, or otherwise elicited testimony that Cassidy was unaware of concerns about B.G.'s hygiene.

*Nursing Assessment*

Plaintiffs do not prove, by a preponderance, that the nursing assessment was inappropriate. For example, Plaintiffs assert that the nursing report was "misleading" as to respiratory issues because Frederickson, the nurse, did not include the information that B.G. had refused to use oxygen when he was under orders to do so at school. (Dkt. 43 at 27.) But, Frederickson reported that B.G. was no longer under orders to use oxygen, so that information was not necessary to the current evaluation. (AR 679.) As another example, Plaintiffs argue

that the nurse did very little to inquire about B.G.'s absences. But she testified to the contrary, and stated that she asked B.G. whether his absences were illness related, and he replied "sometimes he was sick and sometimes he just didn't feel like coming to school." (AR 3253.) And, while at the same time Plaintiffs criticize the nurse for failure to inquire about B.G.'s absences, Plaintiffs also assert that B.G.'s absences "had remarkably little impact on his education, however, since for years, when attending regularly, B.G. had not been learning." (Dkt. 1 at ¶ 15.)

Plaintiffs also blame Frederickson for her inability to control B.G.'s obesity. Frederickson made efforts including teaching B.G. how to read food and nutrition labels. (Dkt. 43 at 29.) Frederickson's failure to consider B.G.'s reading skills in providing this assistance, according to Plaintiffs, was the roadblock that got in his way a lifestyle change, "[the nurse] dropped talking with him rather than finding a way to work with him that did not depend on reading skills he lacked." (Dkt. 43 at 29.) But in the same paragraph, Plaintiffs acknowledge B.G.'s noncompliance with medical advice. *Id.* It's unclear what the nurse could have or should have done. In any event, there is no citation or argument to suggest that the nursing assessment was inappropriate, or that the IHO made some legal error in reviewing it.

*Social Work Assessment*

The IHO did not commit legal error in finding the social work assessment valid. Plaintiffs assert that because Avilas, the social worker, failed to visit B.G.'s home, she did not comply with the Illinois State Board of Education's manual which states that home visits are an important part of the social-emotional assessment. (Dkt. 43 at 31-32.) Notably, the ISBE manual goes on to list the "essential" components" of the assessment, and a home visit is not on that list. And, Avilas addressed those essential components listed in the manual, including: the student

interview, the parent/guardian interview, cultural background assessment, and adaptive behavior assessment.

The IHO also found that a home visit was not necessary because Avilas interviewed J.A.G. and deemed her a reliable informant. Plaintiffs suggest that this was an inaccurate recitation of the record because the social worker actually said she had "'no reason not to' see [J.A.G.] as reliable." (AR 2126) (Dkt. 43 at 32.) Plaintiffs ask the Court to distinguish between the double negative in Avilas's testimony and the affirmative statement in the IHO's findings— but the distinction is meaningless. What matters is that, although she did not go on a home visit, Avilas was able to testify to specific details about B.G.'s apartment and home life. Similarly, Plaintiffs criticism of Avilas not knowing "how small" his apartment was is hollow: "Q. Did you have any sense of the physical dimensions in the space in which B.G. was living? A. B.G. said that it was small. Q. Do you know how small? A. He didn't say how small. They were closed in, there wasn't a lot of the space and he wished it was a larger apartment." (AR 2126; Dkt. 43 at p. 35.) This sort of nit picking does not help Plaintiffs meet their burden.

Finally, Plaintiffs assert that Avilas did not develop a functional behavioral plan, citing only to the testimony of Dr. Goldstein. (Dkt. 43 at 33.) Avilas was asked, "were they [the IEP team] able to use your report to determine the accommodations and modifications?" to which Avilas answered, "[y]es. They were able to use it to determine the accommodations and modifications. My social work goal was driven from my report. There was a social emotional goal for the special education teacher that was also driven from my report as well as my report assisted with the development of the behavior plan." (AR 2124.) She testified that her report was comprehensive because she "included all areas of the student in terms of the academic setting, [she] included the parent's concerns, [and she] included information outside in terms of

the family[.]" (AR 2124-2125.)  The Court sees no reason to disturb the IHO's findings that the social work assessment complied with regulations.

*Assistive Technology Evaluation*

An assistive technology assessment should identify what, if any, devices and services a student needs to increase, maintain, or improve functional capabilities.  20 U.S.C. §§ 1401(a)(1), 1414(d)(3)(B).  Plaintiffs take issue with the fact that Lohman, the assistive technology teacher, "did not mention dictation technology."  (Dkt. 43 at 34.)  But at the hearing, Lohman gave her opinion as to why Cowriter, another software, would be a more useful technology to B.G.  She gave extensive testimony outlining the devices she tried, and that she was well-reasoned in reaching her ultimate conclusions on which would best aid B.G.

Like the other assessors, Lohman used a variety of tools and assessments in formulating her recommendations for B.G.  Ultimately, the IEP team determined that B.G. required services in all areas assessed with the exception of physical and occupational therapy.  Plaintiffs do not prove, by a preponderance of the evidence, that the IHO made any legal errors in finding that these assessments were appropriate.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiffs' Motion to Reverse the Decision of the IHO is denied.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date:  3/20/2017